
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Cause No. CR 07-015-BLG-SPW |
| Plaintiff/Respondent, | CV 11-115-BLG-SPW |
| vs. | REDACTED ORDER[1] |
| FRITZ ANDERSON, | |
| Defendant/Movant. | |

This case comes before the Court on Defendant/Movant Anderson's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255. Reviewing the parties' submissions and the record has taken an extraordinary amount of time. The underlying facts of the case involved a string of controlled drug buys, a search of Anderson's home, and multiple traffic stops, all of which resulted in seizure of methamphetamine, cocaine, ecstasy, or marijuana, sometimes in saleable quantities. With the exception of three counts, every count against Anderson depended, at least in part, on the testimony of cooperating witnesses.

The United States withheld crucial information about benefits it gave a dozen of those witnesses. Neither Anderson nor his counsel could discover what

---

[1] This Order identifies individuals by numbers rather than names.

1

the United States did for its witnesses, because the information was either filed with the Court under seal or not filed at all. The jury did not know the real reasons these witnesses might be biased, might exaggerate, claim to know things they did not know, or just flat-out lie.

## I. Background

A detailed procedural history of the criminal case and proceedings under 28 U.S.C. § 2255 is available in the record. *See, e.g.,* Order (Doc. 469) at 1-5; Order (Doc. 390) at 1-4; *see also* Am. Opinion and Order (Doc. 452).

Briefly, Anderson was indicted with four co-defendants: Teal Rounds, Shantae Harris, Kaydee Goff, and Nathaniel Davis. Rounds and Harris pled guilty more than a month before Anderson's trial. Goff's case was severed to be tried later. Anderson and Davis were scheduled to be tried together, but Davis pled guilty on the morning of trial. *See* Minutes (Doc. 222). Neither Anderson nor Davis testified.

The jury found Anderson guilty on all counts. The mandatory minimum sentence was 120 months. Superseding Indictment (Doc. 71) at 8. Anderson was sentenced to serve a total term of 480 months in prison, to be followed by a 12-year term of supervised release. *See* Minutes (Doc. 318); Judgment (Doc. 319) at 3-4.

## II. Failure to Disclose

This portion of the Order identifies the information that was not disclosed and considers how disclosing it could have altered reasonable jurors' view of the affected witnesses' credibility.

### A. The Obligation to Disclose Information Favorable to the Defense

"[S]uppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The prosecution must disclose to defense counsel evidence in its possession or control if the evidence is favorable to the defense.

In *Giglio v. United States*, 405 U.S. 150 (1972), the Supreme Court considered whether *Brady* also requires disclosure of impeachment evidence. The question arose when, sometime after trial, the defendant's trial counsel "discovered new evidence indicating that the Government had failed to disclose an alleged promise made to its key witness that he would not be prosecuted if he testified for the Government." *Id.* at 150-51. The Supreme Court held that the United States' failure to disclose its promise violated the defendant's constitutional right to due process. *See id.* at 153-55.

"The importance of cross-examination . . . is to reveal a witness' state of mind and, more particularly, the extent of the witness' incentive to testify to the

3

government's satisfaction." *United States v. Larson*, 495 F.3d 1094, 1110 (9th Cir. 2007) (en banc) (Graber, J., concurring in part and specially concurring) (a District of Montana case). Counsel for the defendant must be allowed not only to ask "*whether* the witness was biased but also to make a record from which to argue *why* the witness might have been biased." *Id.* at 1102 (majority op.) (internal quotation marks and brackets omitted) (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)). Counsel cannot make that record, and the jury cannot fairly and accurately evaluate the evidence, when the United States fails to disclose relevant impeachment information within its possession.

## B. Undisclosed Evidence

Twenty-eight cooperating witnesses testified at Anderson's trial. The United States failed to disclose impeachment information about 12 of them:[2] W08, W10, W13, W11, W05,[3] W14, W15, W06, W24, W28, W03, and W07. *See* U.S. Brief (Doc. 498) at 13-21.

In addition, a thirteenth witness, W02, misstated the nature of a promise made to him in his plea agreement. Seykora did not correct the record.

---

[2] The United States asserts that it failed to disclose an immunity agreement given to W17 on July 13, 2006. *See* U.S. Resp. to Order (Doc. 461) at 15. The immunity letter attached as an exhibit, however, was signed by W29. *See* U.S. Resp. Ex. 1 (Doc. 461-1) at 1. W29 and W17 are not the same person. *See United States v. W17*, No. CR xx-xx-BLG-SPW (D. Mont. filed xxxx, 20xx). W29 did not testify at Anderson's trial.

[3] The parties identify this witness as W02. W05 is the witness identified in the memo. *See* U.S. Resp. Ex. 12 (Doc. 461-12 at 1-2).

These witnesses are referred to collectively as "the *Giglio* witnesses."

### 1. The Undisclosed Motions

Eight of the *Giglio* witnesses—W08, W10, W13, W11, W14, W15, W06, and W07—pled guilty to federal crimes before Anderson's trial. W11's plea agreement did not address motions under U.S.S.G. § 5K1.1 or Fed. R. Crim. P. 35(b), which generally authorize a court to reduce a sentence, on a prosecutor's motion, to reward the defendant for providing substantial assistance to law enforcement. The other seven plea agreements stated that motions under § 5K1.1 "and/or" Rule 35 might be filed. The United States did not promise any witness it would file such a motion.[4] All of these plea agreements were disclosed to Anderson.

Anderson's jury knew that all eight of these witnesses had been convicted of felonies and agreed to testify. Two witnesses, W10 and W13, were specifically asked about sentence reductions. Consistent with their plea agreements, they said they "hoped" for reduced sentences. No witness claimed to have been promised anything, and no one claimed to expect anything. *See* 2 Trial Tr. (Doc. 337) at 283:15-284:1 (W13), 341:18-342:3 (W11); 3 Trial Tr. (Doc. 338) at 385:24-386:13

---

[4] *See United States v. W08*, CR xx-xx-BLG Doc. 34 at 9-11 ¶ 14; *W10*, CR xx-xx-BLG Doc. 13 at 8-10 ¶ 15; *W13*, CR xx-xx-BLG Doc. 6 at 11-13 ¶ 14; *W11*, CR xx-xx-BLG Doc. 47; *W14*, CR xx-xx-BLG Doc. 168 at 12-14 ¶ 15; *W15*, CR xx-xx-BLG Doc. 99 at 12-14 ¶ 15; *W06*, CR xx-xx-BLG Doc. 208 at 12-14 ¶ 14; *W07*, CR xx-xx-BLG Doc. 19 at 9-11 ¶ 15.

(W10), 485:4-15 (W07), 491:6-14 (W15), 572:14-24 (W14), 573:19-574:3 (W06); 4 Trial Tr. (Doc. 339) at 612:25-613:3, 615:18-616:12 (W08).

The jury knew other witnesses, too, had been charged with state or federal crimes—for example, W20 and W16. Still other witnesses, including W26 and W25, incriminated themselves in drug trafficking without saying they had been charged with anything. (W26 was not charged, at least not in this Court, but W25 was facing federal trial.) The jury knew some witnesses received "immunity," meaning, so far as the jury knew, that the prosecution could not use the witness's testimony against the witness. The scope of that protection was not explained. *Cf., e.g., United States v. Dudden*, 65 F.3d 1461, 1467-68 (9th Cir. 1995) (explaining that derivative use immunity applies unless the United States expressly says otherwise). The jury did not know what role a prosecutor plays in obtaining a reduced sentence or in filing charges. *Compare, e.g., Larson*, 495 F.3d at 1109-10; *United States v. Schoneberg*, 396 F.3d 1036, 1041-42 (9th Cir. 2005).

In sum, the jurors at Anderson's trial probably inferred that all witnesses who had been or could be charged with federal crimes were hoping to curry favor or reap some benefit from testifying at Anderson's trial. How this might happen and what favors or benefits were available, they did not know.

"There is nothing particularly new" about cooperating witnesses "'singing for their supper.'" *Larson*, 495 F.3d at 1113 (Hawkins, J., dissenting). But W08,

6

W10, W13, W11, W14, W15, W06, and W07 had already sampled the delights of the prosecutor's table. Before Anderson's trial, each received a reduced sentence under U.S.S.G. § 5K1.1 based on their debriefing with agents or testimony to the grand jury against Anderson or others. All eight undisclosed § 5K motions were filed by Assistant United States Attorney James E. Seykora. Seykora personally appeared at each witness's sentencing hearing and spoke with the presiding judge about the extent of the witness's cooperation as well as the reduction the witness ought to receive. Seykora prosecuted Anderson and questioned each of these same witnesses before the jury that decided Anderson's fate.

Because of Seykora, each witness had already obtained the following benefits:

| Witness | Before § 5K1.1 Motion | Sentence Imposed |
|:---:|:---:|:---:|
| W08 | advisory guideline range 84 to 105 months + 60 months 18 U.S.C. § 924(c) | 48 months + 60 months § 924(c) |
| W10 | advisory range 37 to 46 months | 30 months |
| W13 | 120-month mandatory minimum + 60 months § 924(c) | 90 months + 60 months § 924(c) |
| W11 | advisory range 262 to 327 months + 60 months § 924(c) | 190 months + 60 months § 924(c) |
| W14 | advisory range 120-month mandatory minimum to 135 months | 90 months |
| W15 | advisory range 151 to 188 months | 120-month mandatory minimum |
| W06 | 240-month mandatory minimum | 160 months |

| | advisory range | |
|------|------------------------------------------------------|-----------|
| W07 | 151 to 188 months with 120-month mandatory minimum | 113 months |

Neither Anderson nor the jury knew the difference Seykora made in the prison terms of these eight witnesses. Anderson did not learn of the § 5K1.1 motions until almost seven years after his trial. *See* Order (Doc. 451).

But the witnesses certainly knew what they owed to Seykora and how important it was to satisfy him. All eight were eligible for another sentence reduction under Rule 35 if Seykora approved of their performance at Anderson's trial. In a jury's assessment of a witness's "incentive to testify to the government's satisfaction," "the most important piece of the puzzle is the *anticipated benefit* that [the witness] expected to receive if his assistance satisfied the prosecutor," that is, "what the witness hoped to gain and, realistically, could expect to gain." *Larson*, 495 F.3d at 1110 (Graber, J., concurring) (emphasis in original). At Anderson's trial, these eight witnesses did again what they had done before. They could realistically expect to gain another reduction similar to the one they had already received.[5]

---

[5] All but one of the eight witnesses received an additional sentence reduction after Anderson's trial on Rule 35 motions filed, again, by Seykora. Most of the Rule 35 reductions were similar in extent to the § 5K1.1 reductions. W08 went from 84-105 months, to 48 months, to 20 months (reductions of at least 36 and 28 months); W10 from 37-46 months, to 30 months, to 18 months (at least 7 and 12 months); W13 from 120 months, to 90 and then 60 months (30 and 30); W11 from 262-327 months, to 190 months, to 120 months (at least 72 and 70); W15 from 151-188 months, to 120 and then 90 months (at least 31 and 30); W06 from 240 months, to 160 months, to 120 months (80 and 40); and W07 from 151-188 months, to 113 months, to 84

When each of these eight witnesses testified, "there were two trials going on at the same time." "The verdict in [the witness's] trial . . . would be a Rule 35 motion" and "would be delivered by the United States Attorney's Office." *Schoneberg*, 396 F.3d at 1041-42. Not only did the witnesses know what was likely to be on the supper menu if they sang for it, but the § 5K1.1 motions also told each witness what tune Seykora wanted to hear. They already knew what Seykora believed to be the truth.

The jury knew nothing of Seykora's influence over these witnesses or what the witnesses knew about Seykora.

### 2. W13's Phone Calls

With regard to W13, the United States failed to disclose more than its § 5K1.1 motion. More than two years before Anderson's trial, a drug task force officer wrote a report describing a series of recorded jail phone calls between W13 and his girlfriend. In one profanity-laced call on May 10, 2006, the couple discussed whether W13 could get his charges dropped by cooperating with authorities. W13 said, "[T]hey just want to go up the ladder you know, they just want to get people higher and higher." "If I give them all they want maybe they would just fucking drop the charges, the fucking federal charges." The girlfriend

---

months (at least 38 and 39). W14 did not receive a Rule 35 motion. W10's Rule 35 essentially took her down to time served.

suggested W13 "[f]ucking take down that fucking black guy, you know who I'm talking about." W13 responded, "I now [sic] but fucking Nate, I don't know fucking shit about him or anything really, I don't know how to, I don't know." *See* Gov't Ex. 6 (Doc. 461-6) at 3-4 (under seal).

At Anderson's trial, when Anderson's counsel asked W13, "[D]id you ever deal with Nate Davis?" W13 responded, "I don't even know who he is. I've never met him in my life." 2 Trial Tr. (Doc. 337) at 276:8-23.

The jury heard a lot about Nate Davis's activities. Anderson, like Davis, is African-American. Yet in the phone call, when W13's girlfriend referred to "that black guy," W13 assumed she was talking about Davis. In all nine recorded calls, Anderson's name never came up—not "Anderson," not "Fritz," not "Pete," not "Prophecy." Just "Nate." *See* Gov't Ex. 6 (Doc. 461-6) (describing nine calls); Final Pretrial Conf. Tr. (Doc. 335) at 3:13-16 (Anderson's nicknames).

W13 was the second cooperating witness to testify (the first did not recognize methamphetamine when she saw it) and the first whose testimony seriously incriminated himself and Anderson. He claimed that, between 2004 and the end of June 2006, Anderson fronted him more methamphetamine and cocaine than any other trial witness claimed to receive. *See, e.g.*, 2 Trial Tr. (Doc. 337) at 255:20-257:2, 258:7-259:12, 268:4-269:11, 271:16-22. If the jury believed him, W13's testimony alone proved all the elements of all but the marijuana counts of

10

the indictment. Recapping his relationship with Anderson, W13 said, "I've dealt a lot of drugs with a lot of people, so what I'm saying is a lot of it is accurate, but I can't remember the exact amounts. But I've dealt a lot with Fritz, and the meth, the meth, I've sold over 40 pounds; the cocaine is right at about 10 pounds; and ecstasy is about a hundred pills." *Id.* at 271:23-272:2.

A reasonable juror would likely be far more skeptical of W13's claim he "dealt a lot with Fritz" in light of the phone call. *See* Fed. R. Evid. 613(b).

### 3. Non-Prosecution Agreements

On Tuesday, June 10, 2008, an FBI memo addressed to then-United States Attorney William Mercer stated that the cases of several individuals should be closed because they "were prosecuted locally and\or have cooperated in the investigation with the understanding that they would not be charged in [sic] they agreed to testify in federal court."[6] Gov't Ex. 12 (Doc. 461-12) at 1; *see also* U.S. Resp. to Order (Doc. 461) at 19 n.19. Four witnesses who testified against Anderson the previous week were on the list: W05, W24, W28, and W03. When they testified at Anderson's trial, they knew their testimony was earning their exemption from federal prosecution. The jury did not.

---

[6] The memo concludes, "[a]ny Questions concerning this matter can be directed to SA Adam Vandenbosch." Gov't Ex. 12 (Doc. 461-12) at 2 (under seal). Agent Vandenbosch was one of two case agents at Anderson's trial. He was seated at counsel table with the prosecutor throughout Anderson's trial, *see* Final Pretrial Conference Tr. (Doc. 335) at 15:8-13, and testified for the prosecution on the first, second, and fourth day of the four-day trial.

W05 testified that, over an 18-month period, she sold a pound and a quarter of methamphetamine, five pounds of marijuana, and about 100 ecstasy tablets for Anderson, used about four ounces of cocaine she received from him, and occasionally paid down her drug debt by giving Anderson guns she had received in exchange for drugs. *See* 3 Trial Tr. at 408:13-419:8. Her testimony was directly relevant to all but the conspiracy counts of the indictment. No one mentioned anything about her motives or interest in testifying.

W24 testified that he once bought three ounces of methamphetamine from Anderson through his cousin, W03, and bought "teeners" and a quarter-ounce on other occasions. *See* 3 Trial Tr. at 527:10-528:19. Anderson's counsel tried to show that W24 agreed to testify so that state authorities would release him and he would not have to go through withdrawal in jail. *See id.* at 529:5-530:21. On redirect, Seykora implied that W24 did not benefit from his testimony, because he "didn't have [his] charges reduced for possession of Fritz Anderson's dope" and "pled guilty to a felony" in "state court." *See id.* at 528:11-13, 530:25-531:3. The jury did not know that W24's testimony was his ticket out of *federal* prosecution by Seykora.

W03 testified that she saw a handgun laying on Anderson's pants on a bed in a motel room in California; that she did not see him with a gun any other time; that she had previously told agents that Anderson brought marijuana, ecstasy,

12

methamphetamine, and cocaine to Montana from California; and that Anderson gave her about eight ounces of methamphetamine, some of which she distributed to W24. *See* 4 Trial Tr. (Doc. 339) at 674:5-682:21. Thus, the jury heard from two witnesses who corroborated each other—W24 and W03—but did not hear that both of them avoided federal prosecution by testifying.

W28's testimony likely made a significant impression on the jury. She took the stand, gave her name, identified Anderson, and then said, "I'm not testifying today." 3 Trial Tr. at 451:21-452:17. The jury was excused.[7] When Judge Cebull brought the jury back in, he instructed them not to consider W28's refusal to testify as evidence against Anderson. *See id.* at 461:19-462:2. The United States then called W28's stepfather, W31, to tell the jury that a letter from Anderson arrived at

---

[7] The parties and the Court discussed W28's situation at some length. Judge Cebull asked, "Is there some type of immunity?" Seykora responded, "[W]e've told her we do not wish to prosecute her. She knows that. She's a lucky young lady she didn't get indicted in this thing. She's given us statements. We've talked to her before." 3 Trial Tr. at 455:3-8. Seykora did not mention an "understanding" that W28 would not be prosecuted *if* she testified. *See* Gov't Ex. 12 (Doc. 461-12) at 1.

Responding to Anderson's motion for mistrial by explaining that he did not know she was going to refuse to testify, Seykora said he knew 28 "wasn't happy," *id.* at 459:1-2, and he quoted W28's father saying to her, "'You've got to testify. You've got to live up to the agreement,'" *id.* at 460:13-15. Seykora did not say what "the agreement" was. *Cf. Strickler v. Greene*, 527 U.S. 263, 284 (1999) (explaining it is generally reasonable for trial counsel to "rely on, not just the presumption that the prosecutor would fully perform his duty to disclose all exculpatory materials, but also the implicit representation that such materials would be included in the open files tendered to defense counsel for their examination.").

On the other hand, the United States has not indicated *when* it told W28 it would not prosecute her if she testified. If she knew Judge Cebull could compel her to choose between testifying and going to jail, and she *still* told the United States she would not testify, the United States might have struck its bargain with her after she refused to testify on Wednesday and before she testified on Thursday.

his home for W28. He opened it, read it, and called law enforcement. "Adam"[8] took custody of the letter. *See* 3 Trial Tr. at 464:16-467:9. Judge Cebull did not admit the letter into evidence, so the jury did not know what it said. They knew it prompted W31 to call the cops.

The United States called W28 again the following day. She told the jury Anderson dealt marijuana, ecstasy, methamphetamine, and cocaine. She was "sure he did" have a handgun on his person but she never saw one. She knew he made two or six trips to California to get drugs and said W05 and W16 sold drugs for him. She agreed she previously said she saw about 200 ounces of methamphetamine and "more than ten, less than 1,000" ecstasy tablets in her home when Anderson was living with her and previously said Anderson carried a gun for protection when he had cash and drugs. W28 also showed the jury Anderson's name tattooed on her arm. His was not the only name tattooed on her body. *See* 4 Trial Tr. (Doc. 339) at 624:22-643:20.

Anderson tried to show W28's testimony—aptly described by Judge Cebull as "wishy-washy," 4 Trial Tr. (Doc. 339) at 701:9-702:6—indicated that she did not have the personal knowledge to support what she had previously said to the grand jury, did not remember what she had said or what she was thinking when she said it, and was trying to answer Seykora's questions without admitting perjury.

---

[8] Presumably this was Agent Vandenbosch, but the transcript does not make that clear.

*See, e.g.*, 4 Trial Tr. (Doc. 339) at 633:13-634:21, 640:10-641:22, 644:2-646:13.

But Anderson could not suggest a reason why W28, after refusing to testify one day, testified the next.[9]  Neither he nor the jury knew she and the United States "understood" she would not be prosecuted if she testified.

### 4. W02's Testimony and "Immunity"

The United States had no duty to explain to the jury what "immunity" meant.  It did, however, have a duty to correct false testimony.  *See, e.g., Alcorta v. Texas*, 3555 U.S. 28, 31-32 (1957) (per curiam); *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (en banc).

W02 gave the jury an incorrect interpretation of the scope of his immunity:

Q.     And you're testifying under a grant of immunity?

A.     Yes.

Q.     And they've agreed not to charge you?

A.     In the conspiracy, yes.  Well, I received a use of immunity [sic]

---

[9] So far as the jury knew, W28 simply appeared and testified on Thursday.  In fact, Judge Cebull signed an order compelling her to testify.  *See* 18 U.S.C. §§ 6002, 6003; 4 Trial Tr. at 622:3-623:23.  But nothing that occurred made it unnecessary for the United States to tell Anderson of its bargain with her.  Judge Cebull's order gave her derivative use immunity and compelled her to choose between testimony and jail.  So far as the FBI memo indicates, however, testifying gave her transactional immunity, which is broader than the Fifth Amendment parameters of derivative use immunity under 18 U.S.C. §§ 6002 and 6003.  *See Kastigar v. United States*, 406 U.S. 441, 453 (1972); *United States v. Brown*, 979 F.2d 1380, 1381 (9th Cir. 1992) (per curiam) ("we do not rule on . . . the extent of the statutory use immunity granted, because it is the transactional immunity that affords the greater protection from prosecution to the defendant.").  Whether W28 understood her transactional immunity before she refused to testify is unknown, because Seykora did not disclose the United States' promise, and no one had the chance to question her about it.

15

letter that said they couldn't use *the interview* that I did with them against me. *That's all.* If—

Q.  Right.

A.  If they wanted to, they could still charge me with the conspiracy.

2 Trial Tr. at 336:10-18 (emphases added).

W02 was correct that "they could still charge me." But in his plea agreement, the United States promised not to use against him any information he provided in debriefing or in testimony. *See* Plea Agreement (Doc. 22) at 10 ¶ 15(a), (b), *United States v. W02*, No. CR xx-xx-BLG-JDS (D. Mont. xxxx, 20xx). Whether W02 understood this or not was not relevant to the United States' duty to correct the record. *See Hayes*, 399 F.3d at 980-81. Saying that the United States could not use his interview against him but he could still be prosecuted implied that he was taking a risk and "just doing the right thing" by testifying at trial. In fact, he incurred no risk by testifying at trial. His testimony was protected as much as his interview. Seykora did not correct W02's false testimony. *Cf.* Order (Doc. 746) at 5-11, *United States v. Garcia*, No. CR 04-87-BLG-RFC (D. Mont. Sept. 30, 2011).

More than that, W02's plea agreement conferred derivative use immunity.[10]

---

[10] The plea agreement said: "[I]nformation provided will not be used against the defendant in any criminal proceeding, including at his own sentencing. This testimonial restriction does not extend to forfeiture or other civil issues."

*See United States v. Plummer*, 941 F.2d 799, 803, 804-06 (9th Cir. 1991). The United States could not use W02's words as evidence, nor could it use those words "to uncover other incriminating evidence, focus the investigation, decide to initiate prosecution, interpret other evidence, or otherwise plan trial strategy." *United States v. Dudden*, 65 F.3d 1461, 1467 (9th Cir. 1995). The reach of derivative use immunity gives a witness incentive to say as much as possible. A witness willing to lie can use such immunity to please the prosecutor, who is making his own decision about the witness's credibility. *See Schoneberg*, 396 F.3d at 1041-42 (explaining witness testifies to trial jury and also in "mini-trial" with prosecutor as jury). A witness can also use his immunity to protect himself, in the event he is charged, by interposing a burden of proof the prosecutor must meet in a *Kastigar* hearing. *See Dudden*, 65 F.3d at 1468-69 (a Seykora case); *see also Kastigar v. United States*, 406 U.S. 441, 459-61 (1972).

Failure to correct W02's testimony was a relatively minor error in the scheme of the trial, but W02 was not the only witness whose immunity was unclear. So far as the Court is aware, some witnesses, including W26, W22, and W12, *see, e.g.,* 2 Trial Tr. at 305:11-306:20, 308:11-309:2; 3 Trial Tr. at 498:12-499:19, 552:3-4, gave self-incriminating testimony with no immunity of any kind. Witnesses of this sort are likely to appear more forthright and credible. W17, W09, W20, and W18 appeared to be on the same footing, because their immunity

did not come up as an issue. But their plea agreements, like W02's, conferred derivative use immunity.[11]

All that said, an immunity agreement holding a witness harmless for what he says to an agent or a jury is not the same thing as *rewarding* a witness for what he says to an agent or jury. Non-prosecution agreements, which provide transactional immunity, *see, e.g., United States v. Brown*, 979 F.2d 1380, 1381 (9th Cir. 1992) (per curiam), and sentence reductions are the two highest-value benefits a prosecutor can deliver to a witness. The United States provided benefits of that value to 12 witnesses and failed to disclose *all* of them.

## C. Test for Materiality

The United States argues that the undisclosed *Giglio* information was immaterial. It asserts that, even if the testimony of the *Giglio* witnesses is excised from the record, the evidence against Anderson remains "overwhelming." *See* U.S. Brief (Doc. 498) at 23.

This analysis is wrong. *See Strickler v. Greene*, 527 U.S. 263, 289-90 (1999). The United States' approach assumes the non-*Giglio* witnesses were all credible and describes only those portions of their testimony that favored the

---

[11] *See* Plea Agreement (Doc. 515) at 14 ¶ 16(b), *W17*, No. CR xx-xx-BLG-RFC (D. Mont. filed xxxx, 20xx); Plea Agreement (Doc. 2) at 9 ¶ 15(b), *W09*, No. xx-xx-BLG-CCL (D. Mont. filed xxxx, 20xx); Plea Agreement (Doc. 114) at 11-12 ¶ 15(b), *W20*, No. CR xx-xx-BLG-RFC (D. Mont. filed xxxx, 20xx); Plea Agreement (Doc. 5) at 9 ¶ 14(b), *W18*, No. CR xx-xx-BLG-JDS (D. Mont. filed xxxx, 20xx).

United States. *See* U.S. Brief (Doc. 498) at 6-13. This approach would be appropriate if the question was whether the United States presented sufficient evidence to support conviction. *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979). But the *Jackson* test defers to the jury's decision of the case. *See id.* at 326. Here, the question is whether the prosecutor interfered with the jury's ability to assess the witnesses' credibility. There is no justification for deferring to the jury's verdict if the jury was deprived of important information that might have led it to a different verdict.

So, as the Supreme Court explains, "materiality . . . is not a sufficiency of evidence test." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (explaining *United States v. Bagley*, 473 U.S. 667 (1985)). "One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. The analysis must also take into account "the cumulative effect of all . . . evidence suppressed by the government." *Id.* at 421.

The question is whether a reasonable juror, exposed to *all* the trial evidence *plus* the previously-undisclosed evidence, would, to a reasonable probability, have retained reasonable doubt as to Anderson's guilt on one or more counts or as to an elemental drug quantity. *See Turner v. United States*, __ U.S. __, 137 S. Ct. 1885,

19

1893 (2017); *Cone v. Bell*, 556 U.S. 449, 470 (2009). The trial transcript must be viewed from the perspective of a reasonable juror who has not yet decided the case and who applies the presumption of innocence, holds the prosecution to its burden of proof, and otherwise follows the judge's instructions.

In the sections above, the Court has described the previously-undisclosed evidence. Now it must look at all the trial evidence and the issues the jury had to decide.

### III. Analysis

The United States charged Anderson with 30 crimes, including four conspiracies and 26 substantive offenses. It pled three distinct theories of liability: personal liability, aiding and abetting, and conspiracy liability.

Three of the jury's instructions are especially important here:

> In deciding the facts of this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

> The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.

> A separate crime is charged against the defendant in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count.

4 Trial Tr. (Doc. 459) at 6:15-18, 7:7-8, 7:18-21.

The chart below summarizes the superseding indictment (Doc. 71):

| Count | Date | Charge | Brief Description |
|---|---|---|---|
| 1 | 2004 – 2/23/2007 | conspiracy to possess/distribute > 500 g methamphetamine | overall meth conspiracy |
| 2 | 2004 – 2/23/2007 | possession of > 500g methamphetamine with intent to distribute | all meth not captured by Counts 3-16 |
| 3 | 1/12/2006 | distribution of 6.7 grams methamphetamine "through a co-conspirator" (1.4 g actual) | sale between Chartier and W07 |
| 4 | 1/12/2006 | distribution of 12.6 grams methamphetamine "through a co-conspirator" (2 g actual) | sale between Chartier and W07 |
| 5 | 1/19/2006 | distribution of 27.9 grams methamphetamine "through a co-conspirator" (8 g actual) | sale between Chartier and W08 |
| 6 | 1/24/2006 | distribution of 27.6 grams methamphetamine "through a co-conspirator" (12.4 g actual) | sale between Chartier and W08 |
| 7 | 1/31/2006 | distribution of 27.6 grams methamphetamine "through a co-conspirator" (11 g actual) | sale among Chartier, W08, and W07 |
| 8 | 1/31/2006 | distribution of 14.5 grams methamphetamine "through a co-conspirator" (6.3 g actual) | sales among Chartier, W08, and W07 |
| 9 | 2/2/2006 | possession of 17.7 grams methamphetamine (5 g actual) with intent to distribute | search of W07's home |
| 10 | 3/16/2006 | distribution of 13.3 grams methamphetamine "through a co-conspirator" (3.1 g actual) | sale between W08 and W11 |
| 11 | 3/23/2006 | distribution of 48.5 grams methamphetamine (7.7 g actual) | Anderson sale to W08 |
| 12 | 3/28/2006 | distribution of 14.4 grams methamphetamine (2 g actual) | sale among Chartier, Harris, and W08 |
| 13 | 4/13/2006 | distribution of 2.9 grams methamphetamine (0.4 g actual) | sale among Chartier, unidentified person, and Harris |
| 14 | 7/10/2006 | distribution of 250.4 grams methamphetamine to W25 (115.1 g actual) | Anderson sale to W25 |
| 15 | July 2006 | possession of ½ pound methamphetamine with intent to distribute via W20 | Anderson fronted to W26, W20 took and distributed to W22 |

| 16 | 2/23/2007 | possession of 135.9 grams methamphetamine (over 50 g actual) with intent to distribute | search of Anderson's home |
|---|---|---|---|
| 17 | 2004 – 2/23/2007 | conspiracy to possess/distribute > 500 g cocaine | overall cocaine conspiracy |
| 18 | 2004 – 1/17/2008 | possession of > 500 g cocaine with intent to distribute | all cocaine not captured by Counts 19-21 |
| 19 | 6/17/2005 | distribution of 13.7 grams cocaine "by and through" W14 (9.5 g actual) | sale among Chartier, W14, and W06 |
| 20 | 6/21/2005 | distribution of 10.7 grams cocaine "by and through" W14 (8.4 g actual) | sale among Chartier, W14, and W06 |
| 21 | 1/12/2006 | distribution of 5.8 grams cocaine "by and through" W08 (1.7 g actual) | sale between Chartier and W08 |
| 22 | 2004 – 2/23/2007 | conspiracy to possess/distribute ecstasy | overall ecstasy conspiracy |
| 23 | 2004 – 2/23/2007 | possession of ecstasy with intent to distribute | all ecstasy not captured by Counts 24-26 |
| 24 | 3/23/2006 | distribution of ecstasy (9 tablets) | Anderson "bonus" to W08 |
| 25 | 3/25/2006 | possession of ecstasy (4 tablets) with intent to distribute | found in Anderson's car |
| 26 | 2/23/2007 | possession of ecstasy (93 tablets) with intent to distribute | search of Anderson's home |
| 27 | 2004 - 2/23/2007 | conspiracy to possess/distribute marijuana | overall marijuana conspiracy |
| 28 | 2004 – 2/23/2007 | possession of marijuana with intent to distribute | marijuana not captured by Count 29 |
| 29 | 2/23/2007 | possession of marijuana (40.6 grams) with intent to distribute | search of Anderson's home |
| 30 | 2004 – 2/23/2007 | possession of firearms in furtherance of any of four conspiracies, or possession with intent to distribute, or distribution | receiving firearms as payment for drugs |

As to each count, the question is whether reasonable jurors could have drawn inferences supporting Anderson's innocence or had reason not to draw

inferences in favor of the prosecution.

## A. The Conspiracies: Counts 1, 17, 22, and 27

These counts required the United States to prove Anderson agreed with one or more other people to distribute or to possess with intent to distribute methamphetamine, cocaine, ecstasy, and marijuana. "[C]onspiracy requires proof of 'an agreement to commit a crime other than the crime that consists of the sale itself.'" *United States v. Lennick*, 18 F.3d 814, 819 (9th Cir. 1994) (quoting *United States v. Lechuga*, 994 F.2d 346, 347 (7th Cir. 1993) (en banc)); *see also* 4 Trial Tr. (Doc. 459) at 39:11-16, 39:20-21. Thus, evidence that Anderson provided a drug to another person was not relevant to the conspiracy counts unless there was also some evidence that Anderson and at least one other person intended to further distribute the drug.

The United States' principal theory was that Anderson conspired with Nate Davis, but it also asserted that he conspired with others.

### 1. Conspiracy with Nate Davis

Anderson argued he was not guilty of conspiracy because he and Davis were essentially two independent contractors who distributed drugs to some of the same people but lacked any mutual connection or interest in each other's enterprise. *See, e.g.*, 4 Trial Tr. (Doc. 459) at 9:1-11:22 (jury instructions on conspiracy), 65:4-20 (Anderson's closing argument). Therefore, evidence tending to show that

23

Anderson benefitted from Davis's drug trafficking, or at least believed he would benefit, was material to the proof of conspiracy.

Nine cooperating witnesses testified about the relationship between Anderson and Davis. Seven were non-*Giglio* witnesses. Their testimony could be construed in a light favorable to the prosecution, but that was hardly the only way to construe it. When the United States asked W09 whether she remembered telling agents that Anderson was "a part of Nate's posse involved with Davis in distributing illegal drugs," she said she only recalled saying that Anderson and Davis "hung together." 3 Trial Tr. (Doc. 338) at 559:13-20; *see also id*. at 557:9-18. This testimony was not "inconsequential," *see* U.S. Br. (Doc. 498) at 6 n.1, because it tended to support Anderson's theory. W04 testified that he thought Anderson and Davis were "partners" because they were always together and always had a lot of cash, but later in his testimony, he said, "I think they were probably separate, you know. Had different kinds of weed." 4 Trial Tr. (Doc. 339) at 649:11-14, 651:8-19. W16 made four to six trips to California with Anderson but knew almost nothing about Davis. W23 testified that she "heard them all brag," "[t]he whole bunch," about how much money they could make selling meth in Montana but could not say Anderson and Davis were "doing drug deals together or making buys together or selling drugs together." *Id*. at 655:3-656:17.

W21 testified that sometimes, when she called Davis, Anderson would bring drugs to her, or vice versa. *See* 3 Trial Tr. (Doc. 338) at 479:24-480:1. But she also said, "Phones and numbers were interchanged," *id.* at 480:4, and "You weren't sure who was going to answer the phone on the other side." *Id.* at 483:16-20. She might have meant she would talk to Davis and then Anderson brought the drugs, or vice versa, which would support conspiracy. But she might have meant she would call Davis's number and Anderson would answer and then bring the drugs, suggesting Anderson was "stealing" the sale from Davis, or vice versa. This interpretation tends against conspiracy and was supported by part of another witness's testimony. *See* 3 Trial Tr. (Doc. 338) at 388:3-10 (W10). *See also, e.g.,* 2 Trial Tr. (Doc. 337) at 345:25-347:7 (W11); 3 Trial Tr. (Doc. 338) at 483:21-484:6 (W21); *id.* at 539:10-13, 542:4-7 (W20); *id.* at 550:1-21 (W12) (all giving testimony consistent with Anderson's defense).

W19, an ex-girlfriend of Davis, testified that she was present when Anderson and Davis repackaged and "split . . . up between themselves" six ounces of methamphetamine she and Davis brought to Montana from California "around Thanksgiving 2005." *See* 4 Trial Tr. (Doc. 339) at 663:14-664:5. W18 testified that Anderson once brought methamphetamine to her house and began repackaging it while Davis was present but "just at the table with him." *See* 3 Trial Tr. (Doc. 338) at 562:25-563:25, 567:12-568:11. This evidence could be taken to indicate

conspiracy, or it might indicate aiding and abetting, or it might indicate only that Anderson and Davis "met, discussed matters of common interest, acted in similar ways, or perhaps helped one another" by running errands or doing chores. *See* 4 Trial Tr. (Doc. 459) at 9:21-24.

A witness who testified Anderson and Davis shared proceeds of drug sales, pooled their resources to buy drugs, or otherwise recognized mutual benefit from each other's efforts would establish conspiracy. *Giglio* witness W10, an ex-girlfriend of Davis, asserted that Anderson and Davis "pooled their money together at times" in order "[t]o buy drugs . . . [a]nd resell them." Trial Tr. (Doc. 337) at 363:11-18. "[W]hen they would come back [from California], they would split it up and then sell to their customers." *Id.* at 374:24-375:9. W10 also said "Nate Davis told me that they were partners." Davis also told her "that after a while, Fritz started going behind Nate's back and selling to his customers for a cheaper price, and that made Nate mad, and they kind of distanced themselves at that point." 3 Trial Tr. (Doc. 338) at 388:3-10.

If the jury believed W10's testimony, it couldn't have acquitted Anderson of conspiracy; but if it did not believe W10's testimony, it could have acquitted Anderson of conspiring with Davis.[12] The jury did not know that prior to

---

[12] Seykora's Rule 35 motion for W10 said she "provided compelling testimony regarding the partnership between Fritz Anderson and Nate Davis." *See* Rule 35 Mot. (Doc. 30) at 4, *W10*, No. CR xx-xx-BLG-SPW (D. Mont. xxxx, 20xx).

Anderson's trial, Seykora requested and obtained a reduced sentence for W10, the only witness whose testimony directly supported conspiracy between Anderson and Davis.

## 2. Conspiracy With Other Cooperating Witnesses

Seykora told the jury in closing argument that Anderson conspired with *all* the cooperating witnesses who testified at trial:

> Instruction 13, two things must be found beyond reasonable doubt. First . . . there was a conspiracy between two or more persons to commit at least one crime as charged in the superseding indictment.
>
> Who are those persons? Well, the Court reads the charge. It says Shantae Harris, Nate Davis, Fritz Anderson, Kaydee Goff, and others. And others. Ladies and gentlemen, you heard from W13, W26, W02, W11, W28, W10, W27, W03, W05, W18, W08. You heard W20, W15, W22, W07, W25, W21, W24, W14, W06, W01, W04, W23, W19, W09, W16, W17, and W12.
>
> The evidence that was presented to you over the course, those are all coconspirators, too. They all, in one way, assisted, agreed in this conspiracy. Who was the head of the conspiracy? The defendant, Fritz Anderson.
>
> Counsel is going to get up here and say, "The government didn't prove a partnership. There was no, there was no testimony here that Nate and Fritz were partners, and, therefore, it must fail."
>
> Read what the law says, ladies and gentlemen. That's what Instruction 13 says. It has to be an agreement between one or more persons.
>
> I submit there's 20 or 30 persons in this conspiracy, ladies and gentlemen. . . .

4 Trial Tr. (Doc. 459) at 47:6-48:11.[13]

---

[13] Suggesting that every cooperating witness was a coconspirator was careless at best. All the cooperating witnesses testified they saw others receive drugs or received drugs themselves from Anderson; they sold drugs they had obtained from Anderson; or they did

By this theory, Anderson's convictions on the four conspiracy counts remain valid unless Anderson shows a reasonable probability he would have been acquitted of conspiring with Harris, and acquitted of conspiring with Goff, and acquitted of conspiring with each one of the 20 or 30 cooperating witnesses. Phrased in this way, it seems virtually impossible for Anderson to carry his burden of showing the undisclosed *Giglio* evidence was material. But the case still comes down to whether a juror aware of the undisclosed *Giglio* information would have found Anderson guilty beyond reasonable doubt.

The jury had to "decide whether each of the conspiracies charged in the indictment existed, and, if so, who at least some of its members were." 4 Trial Tr. (Doc. 459) at 11:14-16. W26, W20, and W16 appear to offer the strongest support for conviction on Count 1. Each of these witnesses incriminated herself, the other two, and others in a conspiracy with Anderson to distribute methamphetamine. *See, e.g.,* 2 Trial Tr. at 306:24-307:8, 313:7-9, 314:12-18; 3 Trial Tr. at 514:11-20, 517:7-19, 536:10-17, 537:25-538:12, 541:3-7.

W26 was asked, "Did he [Anderson] start giving you meth?" She responded, "Well, he'd front it to me, and then I'd go get rid of it and bring back

---

something (such as making a delivery) that helped Anderson. Not all of them indicated they were fronted drugs by Anderson or sold drugs "for" Anderson, that they received non-user quantities on multiple occasions over a period of time, or even that they paid Anderson for their drugs, as opposed to simply accepting whatever he happened to offer on one or more occasions. A reasonable juror could not have found such witnesses "agreed" to anything or conspired with Anderson.

the money." *See* 2 Trial Tr. (Doc. 337) at 305:11-17. She said she began by receiving "[o]unces, and it just kept getting bigger and bigger," until she received, on one occasion, "[t]wo pounds." *Id.* at 306:8-12. Asked whether she was "making a profit," W26 responded, "Oh, yeah," and said she used the cash to go "[s]hopping all the time." *Id.* at 307:23-308:1. This is a textbook case for conspiracy between Anderson and W26. But Anderson's conviction on Count 1 does not necessarily mean the jury found W26 credible.

W16 said "officers help[ed]" her figure out what quantities of drugs she received from Anderson. *See id.* at 523:25-524:15; *see also* 4 Trial Tr. at 645:15-646:13 (W28). W20's plea agreement provided protection not known to the jury, *see supra* at 17-18.

A reasonable juror who was not sure the testimony of W26, W16, and W20 was good enough to convict Anderson likely would consider the resonance of their testimony with the similar, corroborative testimony given by other cooperating witnesses, including the *Giglio* witnesses. After all, that is one reason a prosecutor calls more than one witness to testify about a nexus of facts: to demonstrate mutual corroboration. But witnesses whose credibility is bolstered by other witnesses may also be less credible when many of the other witnesses are shown to have compelling reasons to fabricate. And proof of a conspiracy to distribute drugs nearly always rests solely on witness credibility because the drugs are rarely

seized.

### 3. Conclusion: Conspiracy Counts

The jurors did not know about W13's phone calls and thirty month sentence reduction, W05's transactional immunity, W11's six-year sentence reduction for his testimony, W10's realistic expectation she would be released from prison for time-served, plus the incentives the United States gave to eight more witnesses. The jury was not allowed to properly assess the credibility of twelve of the government's material witnesses. These *Giglio* violations "undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. The § 2255 motion is granted on Counts 1, 17, 22, and 27.

### B. Drugs Seized from Others: Counts 3-10, 12-13, 19-21

There was no evidence that Anderson personally participated in the transactions described in Counts 3 through 10, 12 and 13, or 19 through 21. Conviction on these counts depended on either a *Pinkerton* theory or an aiding-and-abetting theory.

### 1. *Pinkerton* Theory

A conspirator is liable for the foreseeable acts of his co-conspirators if those acts are committed in the course and in furtherance of the conspiracy. *See Pinkerton v. United States*, 328 U.S. 640, 647 (1946); *see also* 4 Trial Tr. (Doc. 459) at 11:23-12:24 (jury instructions on conspiracy). Because the conspiracy

convictions are invalid, the convictions on these counts are also invalid, under the Pinkerton theory.

### 2. Aiding and Abetting

If the United States had presented any evidence connecting an act by Anderson to any transaction alleged in these counts, his convictions on one or more of these counts might remain valid. But there is no way to tell whether the jury relied on aiding and abetting or *Pinkerton*. Further, only six witnesses were involved in these counts. Five of them—W07, W08, W11, W14, and W06—were *Giglio* witnesses, and the sixth, W18, was W08's stepmother and also had derivative use immunity under her plea agreement. A reasonable juror could doubt these transactions involved any connection to Anderson.

### 3. Conclusion: Drugs Seized from Others

Anderson's § 2255 motion is granted as to Counts 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 19, 20, and 21.

### C. Drugs Seized from or Traced to Anderson: Counts 11, 14, 15, 16, 24, 25, 26, 29

Unlike the counts in the foregoing group, witnesses testified that Anderson personally participated in the transactions described in these counts.

### 1. Counts 11 and 24: W08's Methamphetamine and Ecstasy

*Giglio* witness W08 testified that he received methamphetamine and ecstasy from Anderson on "that day in March," March 23, 2006. *See* 4 Trial Tr. (Doc.

339) at 619:21-620:13. He also said he dealt with Davis, Harris, and a non-testifying witness named W30. *See id.* at 616:7-12, 619:14-15. The question is whether there is a reasonable probability that a jury aware of Seykora's motion to reduce W08's sentence would have acquitted Anderson of distributing methamphetamine and ecstasy to W08 on March 23.

Agent Vandenbosch also testified about the March 23 transaction. He explained that he was with W08 when W08 arranged, via recorded phone call, to purchase two ounces of methamphetamine from Anderson. The agent photocopied twenty-nine $100 bills and gave them to W08 to make the purchase. Vandenbosch and other officers monitored W08 as he met with Anderson. Vandenbosch "watched Mr. Anderson walk into the casino with his friend Fred Roberson and another unidentified black male. They meet W08 in the casino." Then "[t]hey" left the casino and got into "Mr. Anderson's car, which is a silver Pontiac with a temporary tag." In context, Vandenbosch seemed to mean Anderson, W08, Roberson, and the unidentified person were all in the Pontiac. W08 then got out of the Pontiac, and officers followed Anderson's car from the casino to a hotel and from there to a smoke shop, where Anderson met up with W08 again. W08 returned from the deal with two ounces of meth and, as an unsolicited "bonus," nine ecstasy tablets. *See generally* 1 Trial Tr. (Doc. 336) at 14:23-18:14.

Two days later, in the course of a traffic stop, Billings police officers found

"cash in just about every pocket" of Anderson's clothes, totaling $3,801. Of that amount, $2,700 was in $100 bills, and the serial numbers on the bills matched the photocopied cash. *See generally id.* at 18:18-19:3; 2 Trial Tr. (Doc. 337) at 138:15-139:3, 154:8-158:5, 169:4-22.

Based on evidence the United States *did not* present, *see* 4 Trial Tr. (Doc. 459) 4:14-17 (defining reasonable doubt), a reasonable juror could have found that Vandenbosch thought W08 dealt with Anderson because W08 said so. Vandenbosch did not say how he knew he was seeing and hearing Anderson on March 23, 2006. The phone number W08 called was not given. Although the initiating phone call and conversation on W08's body wire were recorded, the United States did not present the recordings, surveillance photographs, or video. Officer Tina Hoger accompanied W08 in the car to the casino and smoke shop, but she did not testify. But the cash was strong evidence that Anderson received money from W08 on March 23.

There is a not a reasonable probability Anderson would not have been convicted on Counts 11 and 24 based on Agent Vandenbosch's testimony about his observations of W08 and Anderson, the fact that W08 returned with two ounces of methamphetamine and nine ecstasy tablets after his meeting with Anderson, and the fact that $2700 in the marked bills from the March 23 drug sale were found on Anderson during the traffic stop two days later. This evidence was unaffected by

33

the undisclosed *Giglio* evidence. The § 2255 motion is denied as to Counts 11 and 24.

### 2. Count 14: W25's Methamphetamine

When Anderson's home was searched in February 2007, Anderson told Agent Vandenbosch he had been living with W28 on Terry Avenue in July 2006. *See* 2 Trial Tr. at 165:24-166:11; 4 Trial Tr. at 626:4-7.

Count 14 was based on testimony from four witnesses. Three law enforcement officers surveilled someone, whom they could not see, coming and going from an apartment at 417 Terry in Billings on July 10, 2006. Cooperating witness W25 said she knew Anderson for about three months before her arrest and that he gave her the methamphetamine she was using. She also said Anderson gave her the 8.8 ounces of methamphetamine found in her purse when she was arrested. *See* 3 Trial Tr. at 399:7-400:12, 443:20-444:2. Officers had trailed W25 from Hysham to and around Billings but could not identify the person she met to obtain the meth. Anderson's conviction on Count 14 depended on W25, not the officers.

W25 was not a *Giglio* witness, but she said the officers who arrested her told her she was "in a lot of trouble" and "if I talked to them, that I may not have to spend—go to jail." *See id.* at 401:24-403:20. Other cooperating witnesses' testimony, including that of the *Giglio* witnesses, tended to corroborate W25's

34

testimony. Like W25, all the *Giglio* witnesses were motivated by a desire to reduce or avoid jail time or prison, too. There is a reasonable probability the jury would not have accepted W25's say-so if it had known of the corroborating *Giglio* witnesses' incentives to testify against Anderson. Anderson's § 2255 motion is granted as to Count 14.

### 3. Count 15: The Half-Pound

Count 15 of the indictment alleged that, in July 2006, W20 "obtained from a juvenile female" "one-half pound of a mixture or substance containing a detectable amount of methamphetamine." Anderson was charged with possessing that half-pound with intent to distribute it. *See* Superseding Indictment (Doc. 71) at 8.

This count depended on the testimony of W26 (the "juvenile female"), who said Anderson gave her eight ounces that she abandoned when her father showed up; W20, who said she took the five or six ounces W26 left and sold it to W22; and W22, who said he received two to four ounces of meth from W20. *See* 2 Trial Tr. (Doc. 337) at 308:7-10, 311:5-21 (W26); 3 Trial Tr. (Doc. 338) at 498:4-499:1 (W22), 536:5-537:4 (W20). W22 did not say anything connecting Anderson to this methamphetamine.

As described above, there were reasons to doubt the credibility of W26 and W20, but their credibility was supported by the fact that many witnesses testified Anderson was selling methamphetamine. There is a reasonable probability that a

jury aware of the significant benefits received by the 12 *Giglio* witnesses would have weighed the corroborating evidence more skeptically and acquitted Anderson. The § 2255 motion is granted as to Count 15.

### 4. Count 25: 4 Tablets of Ecstasy

In the traffic stop on March 25, 2006, when officers found $2,700 of Agent Vandenbosch's cash and over $1,000 in "new" money in Anderson's pockets, they also found four tablets of ecstasy in the car. *See* 2 Trial Tr. at 141:4-143:7; 3 Trial Tr. at 447:24-448:5. "There was one on the [driver's] seat, a couple under the seat, and one behind the seat" as well as "some fragments of broken pieces between the driver's seat and the door itself." 2 Trial Tr. at 143:1-4.

Three other people were also in the car. No one testified to who they were, whether any of them had cash or drugs, or whether they were searched. The car was described only as a small passenger car. Anderson was arrested and taken to jail. In the back seat of the patrol car that transported him, officers found 1.7 grams and 23 grams of marijuana concealed in two separate places. *See* 2 Trial Tr. at 139:23-141:3, 148:2-151:16-20; 3 Trial Tr. at 441:21-442:2. Agent Chartier testified that people could purchase single tablets of ecstasy, but there was also some indication that a user might purchase, *see* 2 Trial Tr. at 87:2-7, and use in one night, *see, e.g.*, 2 Trial Tr. at 304:5-10, more than one tablet. When Anderson was arrested on February 23, 2007, he told Agent Vandenbosch that he "used ecstasy

tablets." *Id.* at 164:6-7.

The jury could have reasonably concluded that Anderson possessed the four ecstasy tablets: Anderson was driving the car, all four ecstasy tablets were found near or on the driver's seat, and Anderson had admitted he was an ecstasy user. But he could have been convicted of possessing those four tablets *with intent to distribute* them only if the jury relied on cooperating witnesses' testimony to infer that Anderson possessed and intended to distribute every drug in his vicinity. The § 2255 motion is granted as to Count 25.

### 5. Counts 16, 26, and 29: Drugs Seized from Anderson's Home

Agents executed a search warrant at Anderson's residence on February 23, 2007. Agents Chartier and Vandenbosch testified to finding methamphetamine, ecstasy, and marijuana in various locations throughout his home. Anderson "could not explain why they were there." 2 Trial Tr. at 167:17-21. Agents took, "from the inside of" a dark coat, a plastic bag containing about four ounces of methamphetamine. They also found 93 ecstasy tablets in a jewelry box and three more tablets found in a white coat; 40.6 grams of marijuana; one scale with residue of methamphetamine and cocaine; one scale with residue of methamphetamine and marijuana; a Barbasol can with a false bottom that contained about 0.8 ounces of methamphetamine; two false-bottomed paint cans, one of which contained cocaine residue; a Doritos can with a false bottom containing $4,260 in cash; a false-

37

bottomed coffee can; and baggies of various sizes. *See* 1 Trial Tr. at 65:2-66:9

(drugs); 2 Trial Tr. at 80:15-97:11 (drugs and cans), 100:23-103:23 (scales), 104:4-

106:21 (baggies); 3 Trial Tr. at 433:18-434:20 (residue). Anderson was charged

with possessing the methamphetamine (Count 16), ecstasy (Count 26), and

marijuana (Count 29) with intent to distribute.

### a. Count 16: Methamphetamine

Officers found about 24.3 grams of methamphetamine in the Barbasol can

(17.8% purity), and about 113.5 grams in a baggie in the dark coat (63% purity),

for a total of 135.9 grams or over a quarter of a pound of methamphetamine. *See* 3

Trial Tr. at 444:12-445:14. Agent Vandenbosch testified that "[a] quarter pound . .

. would be a good quantity where you would start. . . . you would break that down

into smaller quantities, and that's where you begin to make your money." 4 Trial

Tr. at 670:23-671:3.

Finding 135.9 grams of methamphetamine in anyone's home is certainly

incriminating. But Anderson shared the home with Kaydee Goff, whom the jury

had reason to believe was involved in drug trafficking in Billings. *See, e.g.*, 2 Trial

Tr. at 119:25-120:2, 322:2-323:4. Goff's checkbook was found in Nate Davis's

trailer, which was located nearby. *See* 2 Trial Tr. at 119:8-120:2; Exhibit List

(Doc. 237) at 1, Exs. 5 and 6. Other than the items' presence in the home

Anderson shared with Goff, the United States did not present testimony or

38

evidence linking Anderson to the two coats, the Barbasol can or other false-bottomed cans, the paint cans, or the scales.[14]

Agent Chartier testified that a dealer would commonly "cut," or dilute, purer methamphetamine with another agent, such as MSM, and then bag it in smaller quantities for resale. *See* 1 Trial Tr. at 36:13-37:9. W13 testified that Anderson cut his methamphetamine. *See* 2 Trial Tr. at 258:15-21, 270:24-271:2. A forensic chemist testified that dimethyl sulfone ("DMS") was the most common cutting agent she saw, and it would be available as a supplement from a merchant such as GNC. *See* 3 Trial Tr. at 436:11-23, 439:2-14. The larger quantity of meth found in the dark coat was more pure than the eight-ball in the Barbasol can, but the United States presented no evidence of MSM, DMS, or any other cutting agent in the home.

There is not a reasonable probability Anderson would not have been convicted on Count 16 for the following reasons: the large quantity of

---

[14] Eleven months before Anderson's home was searched, on March 30, 2006, he was stopped by police while driving a Tahoe. The vehicle was impounded and searched. Officers found baggies, $1,570 cash on Anderson's person, and a scale with residue of methamphetamine. 2 Trial Tr. at 192:25-194:24; 3 Trial Tr. at 443:6-10. This evidence, though obtained on a different occasion, could be taken to support Anderson's intent to distribute the methamphetamine found eleven months later in his home. But no one testified to where in the Tahoe the scale and baggies were found, and no one testified to whose vehicle it was. Anderson might not even have known the scale and baggies were there. Anderson had a passenger, Fred Roberson, who, like Kaydee Goff, was mentioned by witnesses, including law enforcement, as someone who seemed to be involved in the Billings drug culture. Officers seized the Tahoe because a strong smell of marijuana—not methamphetamine—emanated from it. *See* 2 Trial Tr. at 190:6-191:20.

methamphetamine found in Anderson's home; the scales with methamphetamine residue found; the baggies for packaging the methamphetamine; the amount of cash found; and Anderson's prior sale of methamphetamine to W08. This evidence that Anderson possessed the methamphetamine with intent to distribute it was unaffected by the undisclosed *Giglio* evidence. The § 2255 motion is denied as to Count 16.

### b. Count 26: Ecstasy

Ninety-six tablets is a lot of ecstasy. Agent Chartier testified that "on the street" someone might "request anything from one to a large quantity, to a hundred." He even said volume discounts might be available. *See* 4 Trial Tr. at 671:4-16. W16 testified that she bought 20 "to 50" at a time. *See* 3 Trial Tr. at 524:3-4. Anderson told the agents that he "used ecstasy tablets." 2 Trial Tr. at 164:6-7. Unlike the analysis of the methamphetamine possession in Count 16, there was no hard evidence Anderson possessed the 96 ecstasy pills with the intent to distribute them, rather than for his own personal use. For example, because ecstasy comes in pill form, there were no scales with ecstasy residue found to indicate distribution. Of course, there was the evidence that Anderson had given W08 a "bonus" of nine ecstasy pills on March 23, 2006, but the jury had to rely on the cooperating witnesses' testimony to find both possession *and intent to distribute*. There is a reasonable probability that Anderson would have been

acquitted if the jury had considered all the relevant *Giglio* evidence. The § 2255 motion is granted as to Count 26.

### b. Count 29: Marijuana

According to Agent Vandenbosch, Anderson admitted "he smoked marijuana regularly" and "had flushed a quarter ounce [7-8 grams] of marijuana down the toilet" when the SWAT team entered. *See* 2 Trial Tr. at 164:5-7, 165:10-15. The marijuana found in the home was divided into two portions, one weighing 3.7 grams, the other 36.9 grams. One portion was found on the bed, the other "in certain drawers in the home." 2 Trial Tr. at 90:25-92:15; 3 Trial Tr. at 449:22-450:3. If Anderson used 7 grams of marijuana every day or two, 40.6 grams would last him at most a couple of weeks.

In addition to proving Anderson possessed the marijuana, the United States had to prove Anderson intended this marijuana *for distribution*, by sale or by sharing, rather than his own use. (Possessing this amount of marijuana (less than 60 grams) is a misdemeanor offense in the State of Montana because less than 60 grams of marijuana is considered a personal use amount. *See*, § 45-9-102(2), Montana Code Annotated 2007.) The jury could only have relied on the corroborating witnesses' testimony to find that Anderson possessed and intended to distribute the marijuana found in his home. There is a reasonable probability the verdict would have been different had that overarching theory been examined in

light of all evidence including the undisclosed incentives. The § 2255 motion is granted as to Count 29.

### D. "Residual" Possession With Intent to Distribute: Counts 2, 18, 23, and 28

Four counts captured all conduct—or, more to the point, all drugs—not captured in the other substantive counts. Anderson was charged with possessing and intending to distribute over 500 grams of a substance containing methamphetamine (Count 2, which excluded methamphetamine involved in Counts 3 through 16), over 500 grams of cocaine (Count 18, which excluded cocaine involved in Counts 19 through 21), ecstasy (Count 23, which excluded ecstasy involved in Counts 24 through 26), and marijuana (Count 28, which excluded marijuana involved in Count 29).

#### 1. Count 2: Methamphetamine

Twenty witnesses—W23, W08, W21, W22, W27, W10, W13, W19, W26, W11, W16, W05, W02, W15, W24, W28, W20, W18, W03, and W07—testified that Anderson possessed methamphetamine and distributed or intended to distribute it.

The jury knew that W08, W22, W10, W13, W11, W16, W02, W15, W24, W20, W18, and W07 had all pled guilty to felony drug crimes and probably hoped to gain some benefit from their testimony.

W23, W27, W19, and W26 had neither been charged nor promised they

would not be prosecuted. W23 said she saw Anderson sell two ounces of methamphetamine to a third party, but she did not describe what she saw. She admitted using and selling methamphetamine she received from Davis and another person, but not Anderson. W19 said she once saw Anderson and Davis splitting up methamphetamine between themselves, and she said Anderson distributed methamphetamine, but she did not explain why she thought so. W27 could not identify methamphetamine without the assistance of "Stacey," who did not testify. W05, W28, and W03 appeared to the jury to be on the same footing as W23, W27, W19, and W26, but in fact they had transactional immunity. W21, like W18, was related to a *Giglio* witness.

There is a reasonable probability that Anderson would have been acquitted on Count 2 if the jury had known that testifying was the way out of federal prosecution for W05, W24, W28, and W03; that Seykora had already obtained reduced sentences for W08, W10, W13, W11, W15, and W07; that W02, W20, and W18 incurred no risk by testifying at trial; and that W21 and W18 may also have had concrete expectations that their testimony could help W11 and W08. The § 2255 motion is granted as to Count 2.

### 2. Count 18: Cocaine

W08, W22, W10, W12, W26, W16, W05, W02, W28, and W20 testified that

Anderson[15] possessed cocaine with intent to distribute. Of these people, only W26 appeared to have no potential penal interest in assisting the prosecution, though her credibility might have been questioned on other grounds.

There is a reasonable probability Anderson would have been acquitted on Count 18 if the jury had known that testifying was the way out of federal prosecution for W05 and W28; that Seykora had already rewarded W08, W10, W13, W14, and W06 for their testimony; and that W02 and W20 were not incurring risk by testifying at trial. The § 2255 motion is granted as to Count 18.

### 3. Count 23: Ecstasy

Twelve witnesses—W08, W27, W10, W13, W12, W19, W26, W16, W05, W02, W28, and W20—testified to receiving ecstasy.

In addition, on September 9, 2006, officers found four tablets of ecstasy (not to be confused with the four tablets constituting Count 25) following a traffic stop made while Anderson was on his way to the hospital. Anderson also had over $1,800 in cash and "suspected marijuana." The tablets were admitted into evidence. *See* 2 Trial Tr. at 229:20-232:3. A second person in the vehicle, identified only as "Gully," fled. In view of the small number of tablets and Anderson's statement that he used ecstasy, the jury's finding that Anderson

---

[15]   W17, W14, and W06 testified they received cocaine from Davis, not Anderson. W09 said Anderson used cocaine, not that he distributed it.

possessed and intended to distribute these four tablets of ecstasy, rather than using them, depended on the cooperating witnesses' testimony.

As was the case with methamphetamine, W19 testified that Anderson distributed ecstasy, but she did not explain why she thought so. She received it from Davis. On the page, at least, B.C did not appear to be a reliable witness.

There is a reasonable probability Anderson would have been acquitted on Count 23 if the jury had known that testifying was the way out of federal prosecution for W05 and W28; that Seykora had already obtained reduced sentences for W08, W10, and W13; and that W02 and W20 incurred no risk by testifying. The § 2255 motion is granted as to Count 23.

### 4. Count 28: Marijuana

Count 28 alleged possession of marijuana with intent to distribute. This count was based on two traffic stops[16] and cooperating witnesses' testimony.

The first relevant stop was the one on March 25, 2006, when Anderson was found to have over $3,800 in cash in "just about every pocket," $2,500 of it traced

---

[16] Two other traffic stops failed to produce evidence of possession or intent to distribute. In a stop on March 30, 2006, officers found burnt marijuana residue in a cigar casing, indicating use but not distribution. The scale found in that vehicle showed a trace of methamphetamine, not marijuana or THC. *See* 2 Trial Tr. (Doc. 337) at 188:2-9, 189:2-14, 192:6-194:24; 3 Trial Tr. (Doc. 338) at 442:23-443:10. As described in the preceding section, during a stop on September 9, 2006, an officer saw "a green leafy substance that appeared to be suspected marijuana." 2 Trial Tr. at 231:19-232:2. It was admitted into evidence but not tested or otherwise verified to be marijuana. *See* 3 Trial Tr. at 420:22-451:8, *passim.* Unidentified people were in the vehicle with Anderson each time. *See* 2 Trial Tr. at 189:15-18 (March 30 stop), 228:9-18 (September 9 stop).

back to Agent Vandenbosch. Anderson was driving a small passenger car. Three other people were also in it. There was no testimony showing whose vehicle it was, who the passengers were, whether any of them had cash or drugs, or whether they were even searched. One officer saw a small amount of what appeared to be marijuana on the driver's side floor of the vehicle. Anderson was arrested. The next day, under and behind the back seat of the police vehicle that took Anderson to jail, officers found two packages of marijuana, one weighing 23 grams and the other 1.7 grams. *See* 2 Trial Tr. at 136:25-141:3, 146:5-151:23, 156:2-6, 169:9-22; 3 Trial Tr. at 441:21-442:2. Except that Anderson had about $1,300 in "new" cash, there was no evidence tending to show he was selling, rather than buying for his own use, the marijuana he concealed in the police vehicle.

The second relevant traffic stop occurred on July 9, 2006. Billings police officers responded to a complaint that someone was dealing drugs in a restaurant parking lot. When Officer Feuerstein drove by, he saw four black men standing around a Chevy Suburban. He stopped the Suburban and saw two black men and one white woman inside it. Anderson was in the driver's seat. The other two individuals were seated behind him. The officer asked Anderson to get out of the vehicle. Anderson did not identify himself and appeared to resist taking his hands out of his pockets. He had $100 in cash in his hand. In his pockets and underwear, he had an empty baggie, a baggie containing 12.6 grams of marijuana, unidentified

"metal items," "two ID's," and $2,171 cash.

Later, searching the Suburban, officers found four more baggies containing 0.043, .51, .48 and .54 grams of marijuana as well as $8,000 cash stowed up under the center dashboard—an area where Anderson appeared to be "manipulating something" while he was still in the vehicle. *See* 2 Trial Tr. at 180:8-183:21, 195:13-197:2; 3 Trial Tr. at 449:7-20. There was no testimony about whose vehicle it was, the identity of the male passenger (who fled), or the other two or three men Officer Feuerstein saw when he first drove past the Suburban. The woman with Anderson was W28, *see* 2 Trial Tr. at 184:13-185:3, but when she testified, no one asked her about the incident. In fact, when Seykora asked whether she ever accompanied Anderson when he was distributing drugs, she said, "No." 4 Trial Tr. at 634:23-635:3.

Seizure of marijuana packaged for easy distribution does not establish that Anderson intended to *distribute* it. Anderson could have been buying rather than selling. The cooperating witnesses' testimony was crucial to showing Anderson's intent to distribute. Twelve witnesses—W22, W10, W26, W11, W16, W05, W02, W15, W04, W20, W28, and W01—testified to receiving marijuana from Anderson.

W04 and W01, so far as is known, did not have any arrangement with a prosecuting authority and did not face charges. Nor did either admit selling

marijuana. But a reasonable juror aware of reasons to question the credibility of W22, W26, W16, W02, and W20, and also aware of the substantial motives of W10, W11, W05, W15, and W28, would, to a reasonable probability, view every witness's interests and motivations more skeptically and acquit Anderson of intending to distribute marijuana under these facts. The § 2255 motion is granted as to Count 28.

### 5. Conspiracy Theory

Rather than finding that Anderson was personally liable on one or more of these "residual" counts, the jury's verdict on one or more of them could have rested on a *Pinkerton* theory. As explained above, there is at least a reasonable probability Anderson would be acquitted on the conspiracy counts.

### 6. Conclusion: "Residual" Possession With Intent Counts

On any theory of liability, there is a reasonable probability Anderson would have been acquitted on these "residual" counts if the jury had known of the array of benefits the United States conferred on its witnesses. Anderson's § 2255 motion is granted as to Counts 2, 18, 23, and 28.

### F. Count 30

Count 30 was predicated on Anderson's alleged acceptance of firearms as payment for drug debts. *See* 4 Trial Tr. (Doc. 459) at 34:18-36:12. In closing argument, to support Count 30, Seykora referred to the testimony of five *Giglio*

witnesses: W28, *see id.* at 51:11-15, 54:16-18, 82:25-86:5, W03, *see id.* at 54:19-24, W05 and W13, *see id.* at 55:16-23, and W08, *see id.* at 57:2-3.

Seykora also mentioned W02, W01, and W16. *See id.* at 56:11-22. W16 said that Anderson told someone else he had a gun, but she did not see one. *See* 3 Trial Tr. at 516:14-517:1. W02 said that Anderson showed him a gun in California when they were packing up drugs to return to Montana, but he did not suggest Anderson's possession or display of the gun furthered or related to his drug trafficking. *See* 18 U.S.C. § 924(c)(1)(A); 2 Trial Tr. (Doc. 337) at 330:17-331:6, 337:20-338:11. W01 testified he saw a gun at a party but "can't remember who had it." 3 Trial Tr. at 476:8-23.

Anderson's conviction on Count 30 depended exclusively on *Giglio* witnesses' testimony. His § 2255 motion is granted as to Count 30.

## IV. Conclusion

If law enforcement officers had personal knowledge of Anderson's activities independent of what cooperating witnesses said, Seykora did not establish it at trial. Instead, he called witnesses from Billings' drug culture and asked them to tell the jury who supplied the drugs. But he did not tell anyone he put his own thumb on the scale. He pretended he was just doing his job, presenting evidence, letting the jury decide the facts. In closing argument, he said:

> The United States does not enjoy bringing young men, young women, old women, older men here and putting them on the stand, ladies and

gentlemen. You don't revel in standing next to W28 and impeaching her with grand jury testimony; finally admitting, "Yeah, I said that. He did carry guns in his waistband when he went to collect money when he was selling drugs." Everyone is a human being.

But you folks are entitled to that evidence, and as the Court instructed you early on, you can make a determination who you believe or don't believe, how you take the testimony of each one of these people that you saw sit on the witness stand, whether they were afraid, whether they were minimizing. You heard W11, "Look at the defendant. You know, we're related. If anything, I'm minimizing." And he's only putting 4 to 8 ounces a month on him for three or four months . . . .

Trial Tr. (Doc. 459) at 51:9-24.

It is hard to stomach these words knowing that the person speaking them had obtained a six-year sentence reduction for W11, with the prospect of more time off, and had also promised not to prosecute W28 if she testified. The jury was entitled to that evidence, too.

A jury aware that the United States was taking a position on the evidence by providing the highest-value incentives at its disposal to a dozen of its witnesses would see this case in an entirely different light. *See Kyles*, 514 U.S. at 435. A jury would understand that the prosecutor who decides which witnesses get deals and how much they benefit "ha[s] no personal knowledge of the events" at issue, so "what he would think was true might not actually be true." *United States v. Schoneberg*, 396 F.3d 1036, 1042 (9th Cir. 2005). Seykora must have understood that too, because he was the prosecutor in *Schoneberg*.

A jury aware of the undisclosed *Giglio* information would also weigh more

50

heavily the evidence the United States did *not* present: no photos or recordings from video and audio surveillance, no hand-to-hand sales with the undercover officer, no forensic evidence connecting Anderson to drug paraphernalia seized in traffic stops or from his home, no forensic or documentary evidence suggesting Anderson had regular use of the different vehicles he was driving when drugs or paraphernalia (and unidentified passengers) were found in them, and no evidence about other people, who had access to his home or were present at the scene of the traffic stops, and who could have been providing drugs to Anderson rather than receiving drugs from him. For witnesses who lie casually or who may be desperate to benefit from testifying, it is not difficult to substitute one name for another or represent rumor or belief as truth.

Further, Seykora's failure to disclose his § 5K1.1 motions and the non-prosecution agreement almost certainly affected defense counsel's strategy. Had Anderson's counsel known of these incentives offered by the government, he could have shown the jury that four of the government's witnesses had been granted transactional immunity and eight more knew exactly how much prison time Seykora might be willing to save them. Disclosing the *Giglio* information would have allowed Anderson's counsel to paint a vivid "before and after" picture, *see supra* at 7-8, showing "*why* the witness might have been biased," *Davis*, 415 U.S. at 318, or might lie. And Anderson's counsel would almost certainly have asked

the other cooperating witnesses whether they knew about promises or sentence reductions received by anyone else. At this late date, no one may ever know what benefit other cooperating witnesses realistically expected to receive if they could satisfy the prosecutor. *See Larson*, 495 F.3d at 1110.

Arguably, the convictions on all of the counts should be vacated, given the egregiousness of these *Brady* and *Giglio* violations; however, the Court has confidence in the verdicts on Counts 11, 16, and 24 for the reasons stated above. The Court has no confidence in the verdicts on the remaining counts. Seykora's multiple errors were not harmless.

Accordingly, IT IS HEREBY ORDERED as follows:

1. Anderson's amended motion under 28 U.S.C. § 2255 (Doc. 472) is GRANTED as to Counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 17, 18, 19, 20, 21, 22, 23, 25, 26, 27, 28, 29, and 30 and those convictions are vacated.

2. Anderson's amended motion under 28 U.S.C. § 2255 (Doc. 472) is DENIED as to Counts 11, 16, and 24.

3. Anderson and counsel shall appear before this Court on Thursday, October 25, 2018 at 2:30 p.m. for a status hearing.

4. The Clerk of Court is directed to forthwith notify the parties of the making of this Order.

DATED this _____ 9th _____ day of October, 2018.

Susan P. Watters
United States District Court