IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Cause No. CR 07-015-BLG-SPW |
| Plaintiff/Respondent, | CV 11-115-BLG-SPW |
| vs. | ORDER |
| FRITZ ANDERSON, | |
| Defendant/Movant. | |

**FILED**

FEB 1 4 2019

Clerk, U S District Court
District Of Montana
Billings

This case comes before the Court on Defendant/Movant Anderson's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255. Anderson is a federal prisoner proceeding with counsel.

Other claims have been resolved, but one remains. Anderson claims his trial counsel rendered ineffective assistance by advising him that he was facing a mandatory sentence of life in prison. *See* Anderson Br. (Doc. 450) at 2; *see also* Am. § 2255 Mot. (Doc. 472) at 4; Br. in Supp. (Doc. 473) at 1–2, 2–10.

## I. Relevant Facts

The following facts are taken from the record of the case, from Anderson's testimony at an evidentiary hearing on August 28, 2014 ("Anderson Tr." (Doc. 443)), and from the depositions of trial counsel Brad Arndorfer ("Arndorfer Dep."

1

(Doc. 433-1)) and Assistant United States Attorney Jim Seykora ("Seykora Dep." (Doc. 442-1)). It should be noted that all three of these witnesses testified, and the parties submitted their briefs, before the United States' numerous *Giglio* violations at trial were discovered.

### A. Pre-Trial Proceedings and Trial Verdict

On February 23, 2007, Anderson and his cousin, Nathaniel Davis, were indicted on one charge of conspiring to possess methamphetamine with intent to distribute it and one charge of possessing methamphetamine with intent to distribute it, violations of 21 U.S.C. §§ 846 and 841(a)(1) (Counts 1 and 2); the same two charges with respect to cocaine (Counts 3 and 4); the same two charges with respect to ecstasy (Counts 5 and 6); and the same two charges with respect to marijuana (Counts 7 and 8). They were also charged with possessing or using or carrying a firearm in furtherance of drug trafficking. The time frame of each charge spanned about three years. *See* Indictment (Doc. 1) at 2–6. Based on the drug quantities alleged, conviction on Counts 1 or 2, involving methamphetamine, would subject Anderson to a ten-year mandatory minimum and a maximum sentence of life in prison. If convicted on Count 9, a gun charge, he was subject to a mandatory minimum sentence of five years in prison, consecutive to any

sentence imposed on Counts 1 through 8.[1]  *See* 21 U.S.C. § 841(b)(1)(A)(viii); 18

U.S.C. § 924(c)(1)(A)(i), (D)(ii).

On January 17, 2008, the grand jury handed down a superseding indictment

naming three new co-defendants and adding 21 drug counts to the original charges

against Anderson.  All the new charges fell within the same time span as the

original indictment and arose from controlled buys or drugs found in searches of

Anderson's or a co-conspirator's home.  Two of the new charges, Counts 14 and

16, carried the same statutory penalty range as Counts 1 and 2.  Superseding

Indictment (Doc. 71) at 1 (caption), 3 (Counts 1 and 2), 7 (Count 14 actual), 8

(Count 16 actual).

Anderson was arraigned on the new charges on January 24, 2008.  *See*

Minutes (Doc. 72).  Trial was set for April 7.  *See* Order (Doc. 96).

On March 21, 2008, the United States filed an information under 21 U.S.C.

§ 851.  It alleged that Anderson had one prior conviction for a felony drug offense.

*See* Information (Doc. 119).  Filing of the information doubled the mandatory

---

[1]  At the time the case was litigated, a sentencing court could not take into account a
prison term imposed under 18 U.S.C. § 924(c) in determining the reasonable sentence on any
other count of conviction. *See United States v. Working*, 287 F.3d 801, 807 (9th Cir. 2002); *see
also, e.g., United States v. Hatcher*, 501 F.3d 931, 933–34 (8th Cir. 2007); *United States v.
Roberson*, 474 F.3d 432, 436–37 (7th Cir. 2007).  In 2017, the Supreme Court held that a
sentencing court may vary downward from an advisory guideline range based on the length of a
mandatory consecutive sentence under 18 U.S.C. § 924(c). *See Dean v. United States*, __ U.S.
__, 137 S. Ct. 1170, 1176–77 (2017).

minimum on Counts 1, 2, 14, and 16 from ten to twenty years. *See* 21 U.S.C. §§ 841(b)(1)(A), 851(a)(1). Considering those four counts along with the gun count, Count 30, the effective mandatory minimum penalty was 25 years.

On the United States' motion, trial was continued from April 7 to June 2, 2008. *See* Order (Doc. 146).

On April 1, 2008, Anderson's counsel Brad Arndorfer responded to the § 851 Information. He attached a document describing the "disposition" of the charge cited in the Information as "dismissed." *See* Resp. to Information & Ex. (Docs. 150, 150-1).

These matters stood until Wednesday, May 28, 2008. With trial set to begin the following Monday, Arndorfer moved for leave to enter a conditional guilty plea to Count 1, the methamphetamine conspiracy count, while preserving his right to appeal the denial of his suppression motion. *See* Mot. to Set Conditional Plea (Doc. 200); Fed. R. Crim. P. 11(a)(2); Order (Doc. 70); Arndorfer Dep. (Doc. 433-1) at 33:1–11. Pursuant to a local rule, *see* D. Mont. L.R. CR 12.2 (Jan. 7, 2008), Arndorfer noted the United States would object to his motion. Although he asserted it should not be permitted to object, he acknowledged circuit precedent against him. *See* Mot. to Set Conditional Plea at 1–2 (citing *United States v. Kuchinski*, 469 F.3d 853, 858 (9th Cir. 2006)). Nonetheless, Arndorfer explained:

> We make this motion because we want the record to be abundantly clear that Mr. Anderson accepts responsibility for his actions in distributing dangerous drugs. The issue that is involved with the case is that the amounts, times, and quantities are greatly exaggerated in the discovery, an issue for sentencing as a jury is not able to determine quantities. [Anderson] admits that it is in excess of 500 grams. . . .

Mot. to Set Conditional Plea (Doc. 200) at 2.

Later the same day, the United States rejected a conditional plea "as the defendant will only admit to 500 grams of methamphetamine." Resp. to Mot. (Doc. 205) at 2. Instead, the United States asserted, it would prove at trial "over 15 kilograms of methamphetamine alone," as well as "pounds of cocaine and marijuana, and thousands of ecsta[s]y pills." *Id.*

At the same time, the United States filed a second § 851 Information, alleging that Anderson had three prior convictions for felony drug offenses, including the one alleged in the first § 851 Information. The United States listed the dates of two convictions and case numbers of all three but did not attach judgments or other documentation of the convictions. It noted that "[i]t is difficult to obtain exact records from the State of California in some instances." Second § 851 Information (Doc. 202) at 2 (citing *United States v. Norbury*, 492 F.3d 1012 (9th Cir. 2007)).[2]

---

[2] In deposition, Seykora recalled that trial did not begin until the following September, at least three months after he filed the second § 851 Information. *See* Seykora Dep. (Doc. 442-1) at 15:18–25. In reality, he filed the second § 851 Information five days before trial.

Filing of the second § 851 Information subjected Anderson to a mandatory sentence of life in prison if (1) he was convicted on Counts 1, 2, 14, or 16; (2) he was responsible for at least 500 grams of a substance containing methamphetamine or at least 50 grams of actual methamphetamine; and (3) at least two of the three alleged prior convictions were "felony drug offenses." *See* 21 U.S.C. §§ 841(b)(1)(A), 851(a)(1).

On Friday, May 30, Arndorfer responded to the Second § 851 Information. He said:

> It is defendants understanding that he has no felony convictions of record. He had one felony conviction and that conviction was dismissed.

Resp. (Doc. 212) at 1.

Trial commenced the following Monday, June 2, 2008. *See* Minutes (Docs. 225, 226). At the final pretrial conference, Arndorfer said he "just got a fax in this morning showing that all of [Anderson's] priors . . . have been dismissed." Final Pretrial Conf. Tr. (Doc. 335) at 15:24–16:9. Arndorfer provided a copy to Seykora but did not file anything with the Court. Both parties acknowledged that the significance of the dismissals would "be argued at a later time," not at trial. *Id.* at 16:6–14.

After four days of testimony, the jury convicted Anderson on each count. It also found Anderson responsible for the drug quantities necessary to trigger a

mandatory life sentence on Counts 1, 2, 14, and 16, *see* Verdict (Doc. 243),

provided the United States could prove Anderson had at least two prior felony drug

convictions.

### B. Sentencing

Sentencing was set for September 24, 2008. *See* Order (Doc. 248). On

September 2, 2008, Arndorfer moved to continue the hearing. He said the

presentence report had not been completed, "evidence of prior convictions is

necessary," and "additional information is coming on that issue." Mot. to Continue

(Doc. 278) at 1–2. Sentencing was re-set for October 24. *See* Order (Doc. 281).

On October 20, Arndorfer filed another motion to continue. He said, in part:

> [I]t is clear we have not received the final presentence investigation
> [report]. In the initial presentence investigation, the presentence
> Author used only the drug quantities in the indictment. We have no
> quarrel with them and believe that is the proper quantities to use.
> However, the prosecutor has objected then listed every quantity
> anybody ever mentioned, whether credible or not. It is impossible to
> write a sentencing memorandum or to hold a hearing without knowing
> what the presentence report is going to suggest.

Mot. for Additional Time (Doc. 299) at 1–2; *see also* Fed. R. Crim. P. 32(e)–(f).

Sentencing was again re-set, this time for November 19. *See* Order (Doc. 300).

At sentencing, the parties agreed Anderson had one qualifying prior

conviction for a felony drug offense, establishing a mandatory minimum sentence

of 20 years. *See* Presentence Report ¶ 113; *see also id.* ¶¶ 108, 109, 111

7

(diversionary dispositions).

The advisory guideline calculation was considerably higher. The highest available base offense level on the drug quantity table is 38, corresponding to at least 30,000 kilograms of marijuana.[3] Anderson was held responsible for "about 162,000 kilograms" of marijuana. *See* Sentencing Tr. (Doc. 343) at 80:13–81:4; U.S.S.G. § 2D1.1(a)(3), (c)(1). He received a two-level enhancement for using a minor to traffic in drugs and a four-level enhancement for his leading role in the offense. U.S.S.G. §§ 3B1.1(a), 3B1.4.

Anderson's statutory mandatory minimum penalty remained 20 years, but, with a total offense level of 44 and a criminal history category of III, his advisory guideline range was life. *See* U.S.S.G. ch. 5 Part A cmt. n.2 ("An offense level of more than 43 is to be treated as an offense level of 43.").

Judge Cebull found that a guideline range of 360 months to life was more appropriate than a range of life. *See* Sentencing Tr. at 101:18–102:7. He sentenced Anderson to 420 months on the drug counts, plus the five-year consecutive term on the gun count, for a total prison term of 480 months. *See id.* at

---

[3] Base offense levels under the guidelines depend on the quantity of a particular drug the defendant trafficked. When a defendant is sentenced for trafficking in multiple drugs, the Sentencing Guidelines convert each drug to marijuana. *See* U.S.S.G. § 2D1.1 cmt. n.10(B), (E) (Nov. 1, 2007). For instance, one gram of a substance containing methamphetamine is deemed equal to 2 kilograms of marijuana. A gram of actual methamphetamine is deemed equal to 20 kilograms of marijuana.

103:19–25; Judgment (Doc. 319) at 3.

### C. Behind the Scenes

#### 1. Plea Bargaining

From the outset of the case, Anderson was "eager" for a plea bargain. *See* Arndorfer Dep. (Doc. 433-1) at 37:15–19; *see also id.* at 7:16–18, 21:9–12; Anderson Tr. (Doc. 443) at 9:7–10, 17:2–16. However, when Arndorfer contacted Seykora to discuss possible sentences, Seykora's response was, "You know, you can plead if you want to. But the only deal you're going to get is that he goes away for life." Arndorfer Dep. at 8:19–21. According to Arndorfer, "[T]his case was a big to-do for Jim [Seykora]. Jim thought he had his first life without parole case, and he was going to get him 'cause he didn't like Fritz Anderson." *Id.* at 39:20–23.

Seykora, in his deposition, was asked whether he "started day one of the Fritz Anderson trial" with the understanding "that this was a mandatory life case." He explained he "felt mandatory life for two reasons":

> Seykora:   Number one is the prior conviction, if nothing else the amount of dope we had. Particularly, I mean, if he gets convicted, he's not going to accept his responsibility.[4] And without any minor enhancements or anything else, it's going to be a level 44 or something, which under the guidelines is life.

---

[4] Presumably Seykora meant Anderson would not receive credit in his guideline calculation for acceptance of responsibility if he were convicted at trial.

| | |
|---|---|
| Stephens: | Right, but that would be advisory, not mandatory? |
| Seykora: | Right. |
| Stephens: | Okay. |
| Seykora: | I guess we're just arguing at that point, mandatory or life. |
| Stephens: | Well, I mean, would you agree with me, I guess, that there's a difference between a mandatory sentence that the judge may— |
| Seykora: | Sure, sure, the court's hands are tied, yeah. |
| Stephens: | Versus guidelines? |
| Seykora: | Certainly. Certainly. |

Seykora Dep. at 15:18–21, 16:10–17:6.

Anderson's habeas counsel also asked both Arndorfer and Seykora whether they ever discussed the prospect of Anderson's debriefing. Arndorfer responded:

I can tell you this: No. The answer in simple terms is no. I remember talking to Seykora about, hey, do you think he [Anderson] could help you out in California? And I remember Seykora's response: I don't give a shit about California or any drug dealers out there. Fritz Anderson needs to go away for life. He was not interested in any cooperation from Fritz Anderson.

Arndorfer Dep. at 44:11–22.

Seykora's testimony on this issue differed. He said, "It was pretty clear to us in our investigation the source stuff was coming out of California and pretty

clear that it was probably related to Mr. Anderson's family members." Seykora

Dep. (Doc. 442-1) at 9:25–10:3. He continued, "[V]ery frankly, my recollection,

plea agreements revolved around the fact that Fritz ain't going to talk about

anybody. . . . I think Brad [Arndorfer] basically said, you know, without saying his

family is involved, that he's not going to give up his folks." *Id.* at 10:15–18, 11:4–

6. "And that was, to me, a stumbling block." *Id.* at 10:20.[5]

## 2. Investigation of Anderson's Criminal History

Arndorfer testified in deposition that the criminal history the United States

produced in discovery "was poor, vague." "Seykora was saying, we've got these

prior convictions." But Anderson and Arndorfer "had a bunch of documents that

indicated [Anderson had] been charged without dispositions." Arndorfer Dep.

(Doc. 433-1) at 11:17–25. Anderson told Arndorfer he had been charged with

some drug felonies but they were dismissed or reduced to misdemeanors after he

completed "some type of probation" or classes. *See, e.g.*, Anderson Tr. (Doc. 443)

at 12:5–13:1; Arndorfer Dep. at 19:25–20:10, 30:8–18.

In an attempt to determine whether the prior convictions would qualify

---

[5] A jury convicted Anderson's brother, Gregory Boyd, in February 2007, the day before Anderson's indictment and arrest. Seykora prosecuted the case. Boyd was sentenced about six weeks after Anderson's trial. *See United States v. Boyd*, No. 06-28-BLG-SPW (D. Mont. filed Feb. 16, 2006). Seykora said he believed another of Anderson's brothers and other family members were involved as well. *See* Seykora Dep. at 10:10–15. Co-defendant Nate Davis was Anderson's cousin.

Anderson for a higher penalty, Arndorfer contacted California courts, but he did not get much out of them. *See* Arndorfer Dep. at 12:1–13:5, 23:8–24:10. Seykora also attempted to obtain information from the California courts and also did not succeed. He said he often thought "that when I retired I was going to start a firm of doing nothing but attempting to get certified convictions out of California . . . . [I]t's very difficult to get." Seykora Dep. (Doc. 442-1) at 12:13–17. "Generally speaking, we want them [records of prior convictions] at the very beginning, hot off the press, certified, you know. That doesn't always happen. Like I say, California is a tough state to get these things." *Id.* at 19:7–10. But, Seykora said, "I tried to run down former prosecutors in Contra Costa County and talked to them and exchanged e-mails and things and they were very helpful." *Id.* at 16:1–3.

Arndorfer "agree[d]" that "clients would want some certainty on how that 851 is going to fall out before they make a decision on whether to proceed to trial or . . . take a plea." Arndorfer Dep. at 36:2–7. But, he said, "I had no way of providing Fritz Anderson the certainty that he needed. I couldn't get it out of California. Seykora indicated he couldn't get it out of California. . . . but he was absolutely adamant that he had the proof or was going to get the proof." *Id.* at 36:22–37:3. Arndorfer "just did not believe Jim Seykora didn't have what he said he had. I believed Jim Seykora when he said, [Anderson is] facing life." Arndorfer Dep. at 24:19–22. "[T]he first time I talked to him and every time I

12

talked to him," Seykora told him Anderson had "at least two or three priors. We're going to get him for life." *Id.* at 19:14–16.

### 3. Anderson's Options

Arndorfer could not compel Seykora to plea bargain. He could not conclusively refute or confirm Seykora's insistence that Anderson had prior convictions supporting a mandatory life sentence. Considering those two facts, Arndorfer presented various options to Anderson, including an open plea; a plea to all but Count 30, the gun count; a conditional plea; or trial on all counts. *See, e.g.,* Arndorfer Dep. at 28:7–29:15, 51:9–22. Ultimately, Arndorfer filed the motion to enter a conditional guilty plea to Count 1 and, when it was rejected, took the case to trial.

### 4. Anderson's Testimony at the § 2255 Evidentiary Hearing

Anderson testified that he would have pled guilty if Arndorfer had told him, "Fritz, I've investigated. You've got one predicate prior. That makes you're [sic] eligible for one 851 enhancement" and "[y]our statutory sentence range is 20 to life." *See* Anderson Tr. (Doc. 443) at 16:20–17:4. Anderson went on to describe his interest in a plea agreement and Arndorfer's explanation that Seykora was simply not going to offer one. *See id.* at 17:5–18:5. He concluded:

> I would have pled guilty and then tried to argue for a lesser guidelines for—because, you know, they used enhancements to enhance my sentence and increase my drug amount in this case. . . . But if I was

able to plead guilty, then I can just still argue those, you know, instead of having to go to trial.

Anderson Tr. at 18:17–24.

## II. Analysis

Anderson contends that Arndorfer violated his Sixth Amendment right to the effective assistance of counsel because he did not adequately investigate Anderson's criminal history and so could not tell him, before he chose between pleading guilty and standing trial, whether he faced a ten-year mandatory minimum sentence, a 20-year mandatory minimum sentence, or a mandatory sentence of life in prison. Anderson also asserts that he would have pled guilty had he known he was *not* facing a mandatory life sentence.

Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Anderson must show (1) that counsel's performance fell below an objective standard of reasonableness, *id.* at 687-88, and (2) that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "[T]here is no reason . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

"A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result

of reasonable professional judgment." *Strickland*, 466 U.S. at 690. The court must then "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," *id.*, making "every effort . . . to eliminate the distorting effects of hindsight," *id.* at 689. With that caveat in mind, it is nonetheless true that "[a]n accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings, and laws involved and then to offer his informed opinion as to what plea should be entered." *Von Moltke v. Gillies*, 332 U.S. 708, 721 (1948).

## A. Did Arndorfer Know Anderson's Statutory Penalty Range?

Two penalty ranges are relevant at a federal sentencing hearing. One is the guideline range. The sentence can fall above, within, or below the guideline range, because the guidelines are only advisory. But the other penalty range is set by statute and consists of a "floor" and a "ceiling." The sentence cannot fall below the floor or above the ceiling; in that sense, the statutory range is not advisory but mandatory. If Anderson had no prior felony drug convictions, the floor was ten years and the ceiling was life. If he had one prior felony drug conviction, the floor rose to 20 years. With two or more prior convictions, floor and ceiling would merge, and his sentence would be life in prison. *See* 21 U.S.C. § 841(b)(1)(A); *Williams v. United States*, 651 F.2d 648, 649–51 (9th Cir. 1981).

15

By the time of trial, Arndorfer knew Anderson's prior felony convictions were dismissed. *See, e.g.*, Arndorfer Dep. (Doc. 433-1) at 12:12–15; *see also* Resp. to Information Ex. (Doc. 150-1); Final Pretrial Conf. Tr. (Doc. 335) at 15:24–16:14. After Anderson was indicted, but well before trial, the Ninth Circuit decided that a "dismissed state conviction qualifies as a prior conviction if the . . . dismissal does not alter the legality of the conviction or does not represent that the defendant was actually innocent of the crime." *United States v. Norbury*, 492 F.3d 1012, 1015 (9th Cir. 2007). Therefore, to ascertain Anderson's penalty range, Arndorfer needed to know not merely whether the prior convictions were dismissed, but why. Arndorfer seemed to believe the dismissals meant the convictions would not count. *See, e.g.*, Arndorfer Dep. at 12:17–18, 13:6–14:1. There is no evidence he knew why they were dismissed or knew the reason for dismissal was important. He admitted "[i]t wasn't until sentencing that we found out" one of Anderson's prior convictions was dismissed because he fulfilled the terms of the judgment against him so, under *Norbury*, the conviction counted against Anderson. *See* Arndorfer Dep. at 13:7–9.

When Arndorfer was advising Anderson about his choice between pleading guilty and going to trial, Arndorfer did not know whether Anderson would face a mandatory minimum sentence of ten years, 20 years, or life if convicted on Counts 1, 2, 14, or 16.

16

## B. Was Arndorfer's Investigation Reasonable?

Anderson argues that Arndorfer should have ascertained the correct statutory penalty range to enable Anderson to decide whether to plead guilty or stand trial. In effect, he says, it was unreasonable for Arndorfer to believe Anderson could make an intelligent choice between pleading guilty or going to trial without knowing the mandatory minimum sentence he would receive. For two reasons, this argument is not persuasive.

### 1. 21 U.S.C. § 851

The United States must give the defendant notice, "before trial, or before entry of a plea of guilty," of the convictions it will rely on to seek increased punishment. *See* 21 U.S.C. § 851(a)(1); *see also United States v. Severino*, 316 F.3d 939, 943–45 (9th Cir. 2003) (en banc); *United States v. Espinal*, 634 F.3d 655, 662 (2d Cir. 2011). The notice is adequate if "the defendant will have no trouble understanding which prior conviction the prosecutor means to identify." *Severino*, 316 F.3d at 943–44.

The procedure set forth in § 851 does not guarantee defendants will know, *before* choosing between pleading guilty and standing trial, whether a prior conviction will support an enhanced sentence. That question is answered only "after conviction but before pronouncement of sentence." 21 U.S.C. § 851(b), (d)(1). For instance, § 851 expressly allows federal sentencing courts to hear

17

collateral attacks on the validity of prior convictions.[6] *See, e.g., Custis v. United States*, 511 U.S. 485, 491–92 (1994) (discussing § 851(c)). Only "after conviction" does the federal court decide whether the prior conviction is constitutionally valid. *See* 21 U.S.C. § 851(b), (c)(1), (d)(1); *see also Espinal*, 634 F.3d at 659–67 (discussing procedure where defendant did not admit being the person who sustained the prior conviction).

This procedure is not unusual or unfair. A defendant does not know whether a jury will convict him when deciding whether or not to go to trial, either. Like an indictment, an information under § 851 "ensures proper notice so a defendant is able to challenge" the allegations against him and "make an informed decision about whether or not to plead guilty." *United States v. Hamilton*, 208 F.3d 1165, 1168 (9th Cir. 2000), *quoted in United States v. Sperow*, 494 F.3d 1223, 1226–27 (9th Cir. 2007). With the assistance of counsel, a defendant makes reasonably well-informed predictions and contemplates options and possible outcomes, all considering the applicable law and the evidence. Certainty is not the criterion.

Arndorfer's advice regarding the prior convictions was not unreasonable. Anderson knew which convictions were at issue. *See* Second § 851 Information

---

[6] Collateral attack under § 851 carries a five-year limitations period. *See* 21 U.S.C. § 851(e). But in any case, a defendant may put the United States to its burden of proving that he is the person who "has been previously convicted as alleged," § 851(b), and that the prior conviction is a qualifying one under the case law.

(Doc. 202) at 2.  He knew he would be sentenced to life in prison if two or more of them counted against him or a minimum of 20 years if one counted against him. *See, e.g.*, Anderson Tr. (Doc. 443) at 6:13–7:17.  He knew the United States insisted it could prove two or more, and he knew Arndorfer could not tell him whether the proof was sufficient to support a mandatory life sentence. *See, e.g., id.* at 8:22–25, 10:24–13:1, 16:5–18, 23:11–16.  Anderson knew what he was entitled to know.  He balanced all the risks by choosing to go to trial. *See id.* at 5:22–6:1.

It does not appear that Anderson knew some dismissed convictions could count against him while others did not.  As a result, he probably did not recognize a high probability of a 20-year mandatory minimum sentence.  He probably believed all his convictions would count or none would count, so the minimum would be either ten years or life.

In another case, the difference between a 10 year mandatory minimum or a 20-year mandatory minimum could well be a critical factor in a defendant's decision whether to plead guilty or go to trial.  But here, due to the prosecutor's approach to Anderson's case, it was not.

### 2.  AUSA Seykora

Arndorfer could not recall exactly what he did to investigate Anderson's prior convictions.  But, he said, "I can tell you that none of that really played a strong role in discussions about going to trial." *Id.* at 14:8–10.  As Seykora put it,

19

"Floor is different than ceiling." Seykora Dep. (Doc. 442-1) at 24:10, *quoted in* Anderson Br. (Doc. 450) at 1. What demanded counsel's attention in Anderson's case was not the floor. It was the ceiling.

Based solely on the allegations of the original indictment, Arndorfer knew the ceiling on Counts 1 and 2 was life in prison, regardless of Anderson's prior convictions. Arndorfer said he did not do a "solid" guideline calculation, "because the quantities were so nebulous," but he did a ballpark calculation. "I told [Anderson], you know, if they use all of these quantities that this goofball from Laurel was going to talk about," Anderson "might be facing life even under the guidelines."[7] Arndorfer did not "think a judge would give him that," but it was still true that "the guideline calculations show you up at least a level 40, or whatever it was." Arndorfer Dep. at 16:21–17:24. Even setting aside the goofball, the drug quantity indicated by the pretrial discovery put Anderson in the highest offense levels. *See, e.g.*, Seykora Dep. at 25:17–26:23. And, on top of the guideline sentence, there would be a five-year mandatory minimum consecutive sentence if Anderson were convicted on the gun count. *See* Arndorfer Dep. at 29:7–15.

---

[7] Arndorfer was referring to one of the cooperating witnesses. The "goofball" attributed to Anderson a significantly larger drug quantity than other witnesses.

Arndorfer also knew Seykora was determined to obtain a life sentence for Anderson. *See, e.g.*, Arndorfer Dep. at 8:10–9:14, 11:13, 14:12, 17:4–5, 19:12–16, 21:16–17, 24:21–22, 32:2–4, 51:1–2. Arndorfer was talking about Seykora's position on Anderson's prior convictions. But, in addition, five instances of Seykora's conduct throughout the case demonstrate his intent to obtain the harshest sentence he could.

First, Seykora declined plea bargaining. Arndorfer "talked to Seykora on two, if not three, different occasions. Come on, can't we do something?" Seykora said, "No." Arndorfer said, "I even recall Jim telling me at one point, I wouldn't plead him. I mean, he's going away for life." Arndorfer Dep. at 21:13–17. "[T]he only deal you're going to get is that he goes away for life." *Id.* at 8:20–21.

Second, when Anderson moved to enter a conditional guilty plea to Count 1, Seykora objected. To be clear, if Seykora truly believed Anderson had two prior felony drug convictions, a conditional guilty plea to Count 1 would have established a mandatory sentence of life in prison. Still, Seykora objected. In his objection, he did not mention the § 851 Information he filed along with his objection to Anderson's motion. He did not object to Anderson's omission of the § 924(c) charge, Count 30, with its mandatory consecutive five years. The sole basis for Seykora's objection to a conditional plea to Count I concerned the guideline drug quantity – a fact he would typically prove without a trial. Seykora said:

> [U]nder the facts and evidence in this case, the United States will not agree to a conditional plea at this time as the defendant will only admit to 500 grams of methamphetamine. At trial, the United States will establish over 15 kilograms of methamphetamine alone, and this does not include pounds of cocaine and marijuana, and thousands of ecstasy pills.

Resp. to Mot. (Doc. 205) at 2.

"[O]ver 15 kilograms of methamphetamine alone" was the quantity of methamphetamine corresponding to a base offense level of 38, the highest available on the guidelines drug table. *See* U.S.S.G. § 2D1.1(c)(1) (Nov. 1, 2007). Contrary to Arndorfer's belief that "the guideline calculations were not important to Seykora," Arndorfer Dep. at 16:18–10, Seykora's objection to the conditional plea shows that he intended to produce evidence of drug quantity that would put Anderson in the highest possible guideline range, irrespective of the statutory penalty range.

Third, in his deposition, Seykora said he thought a life sentence was viable "[n]umber one" because of "the prior conviction" and "if nothing else the amount of dope we had." Seykora Dep. at 16:12–13. Seykora said "conviction," singular. A single prior conviction would not support a life sentence. And habeas counsel asked Seykora whether Anderson's prior convictions actually played any role in Seykora's assessment of what would be an appropriate sentence:

> Stephens: [W]ould your position, had you known, that once the smoke cleared there was only one prior and the

mandatory range would have been mandatory 20, would that have changed your—

Seykora:     Mandatory minimum.

Stephens:    Right, mandatory minimum.

Seykora:     Floor is different than ceiling.

. . .

Stephens:    Would it have changed your opinion or how you approached the case?

Seykora:     No.

Stephens:    Okay.  Offered Mr. Anderson any other deal?

Seykora:     No.

. . .

Stephens:    Did the drug amount increase based on the testimony of the—

Seykora:     No.

Stephens:    —of the government's witnesses?

Seykora:     No.  You mean trial versus what we had before?

Stephens:    Yeah.

Seykora:     No.

Stephens:    Not, you don't think it did?

Seykora:     No.

Seykora Dep. (Doc. 442-1) at 24:1–7, 24:11–16, 25:17–26:1.

Fourth, at trial, Seykora withheld material impeachment information about 12 of 28 cooperating witnesses and failed to correct a misstatement by a thirteenth. *See* Redacted Order (Doc. 506) at 4–18. At sentencing, he again relied on the credibility of those witnesses to establish the drug quantity supporting the base offense level. He re-emphasized the testimony of one trial witness in particular. Seykora again failed to disclose not only the § 5K1.1 motion he personally filed for that witness before Anderson's trial, but also a phone call suggesting the witness dealt with Anderson's co-defendant, not Anderson.

Fifth, Seykora's sentencing memorandum focused heavily on drug quantities. A draft presentence report evidently predicated the base offense level on the drug quantities specified in the superseding indictment and found by the trial jury. *See* Mot. for Additional Time (Doc. 299) at 1–2; *see also* Verdict (Doc. 243). The verdict form asked the jurors to agree only on statutory threshold amounts, *see, e.g.*, Verdict (Doc. 243) at 3–4 (Counts 2–5), not the specific amounts involved in the transactions alleged by the grand jury, *see, e.g.*, Superseding Indictment (Doc. 71) at 4 (Counts 3–5). But a reasonable probation officer could have included the specific amounts charged in the superseding indictment in calculating the drug quantity. Those amounts support the following calculation:

| Counts | Meth (Actual) | Meth (Mixture) | Cocaine | Ecstasy | Marijuana |
|---|---|---|---|---|---|
| 1 & 2 | 50 g | | | | 1,000.000 kg |
| 3–14, 16 | 224.4 g | | | | 4,488.000 kg |
| 15 | | ½ lb. = 226.8 g | | | 453.600 kg |
| 17 & 18 | | | 500 g | | 100.000 kg |
| 19–21 | | | 30.2 g | | 6.040 kg |
| 22–26 | | | | 106 tablets @ 250mg/tab = 26.5g | 13.250 kg |
| 29 | | | | | 40.6 g = 0.041 kg |
| Marijuana Equivalent | 1g = 20 kg | 1g = 2 kg | 1g = 200 g | 1g = 500 g | 6,060.930 kg |

By the Court's calculations, the jury found a total of 6,060.93 kilograms of marijuana, corresponding to a base offense level (in 2007) of 34. With a four-level enhancement for his role in the offense and a two-level enhancement for using a minor in drug trafficking, Anderson's total offense level would have been 40. With a criminal history category of III, the advisory guideline range would have been 360 months to life in prison. Again, this range is based solely on the jury's verdict.

Seykora objected that the base offense level should be 38, the highest level available on the drug table. To reach it, the United States had to prove Anderson was responsible for at least 30,000 kilograms of marijuana, or 15 kilograms of a substance containing methamphetamine. *See* U.S.S.G. § 2D1.1(c)(1) (Nov. 1, 2007). The "goofball's" testimony alone, if credited, established at least 22.68 kilograms of methamphetamine, or at least 45,360 kilograms of marijuana. *See*

U.S. Sentencing Mem. (Doc. 314) at 10–11. That was far more than necessary to reach a level of 38. Seykora did not stop there. Still considering only methamphetamine, three other cooperating witnesses, if credited, attributed 16.8 kilograms to Anderson, or 33,600 kilograms of marijuana—again, a base offense level of 38. *See id.* at 9–10, 11, 13. Seykora did not stop there either. He laid out drug calculations based on the testimony of every single one of the 19 cooperating witnesses, including methamphetamine, and cocaine, and ecstasy, and marijuana, to arrive at a total of 121,631.74 to 131,453.74 kilograms of marijuana. *See id.* at 9–17.

This calculation is not legally objectionable. But it shows Seykora left no gram unturned in his determination to obtain the longest sentence he could for Fritz Anderson. The sentencing memorandum verifies Arndorfer's recollection of Seykora's position before trial: "[T]he only deal you're going to get is that he goes away for life." Arndorfer Dep. at 8:20–21. It also verifies Seykora's "feeling" before trial that it was a "life" case, based on "the amount of dope we had." Seykora Dep. (Doc. 442-1) at 16:13.

In sum, all of this evidence shows that Seykora believed "Fritz Anderson needs to go away for life," Arndorfer Dep. at 44:20, and would use any tool available to him as a prosecutor to make that happen.

### 3. Conclusion

"[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. Arndorfer faced a prosecutor intent on getting Anderson sentenced to life in prison; witnesses whose statements supported drug quantities and enhancements that would result in a life-range sentence under the guidelines; and, an intelligent client who understood that neither the guidelines nor the statutory penalty range was favorable to him. *See* Arndorfer Dep. at 12:7

A competent defense attorney in that position can reasonably decide not to invest significant effort in factual or legal investigation before trial to determine whether his client faces a 20-year *minimum* sentence. Counsel need not concern himself with the floor when even the best-case scenario has his client butting up against the ceiling.

Whether Arndorfer reasonably advised Anderson about his options considering these facts is a separate question.

### B. Did Arndorfer Give Anderson Reasonable Advice?

Although attorney and client agreed Anderson had only a reasonable-doubt defense to the 29 drug crimes alleged against him, Arndorfer nonetheless recommended that Anderson go to trial. Contrary to Anderson's current claim, *see*

Anderson Br. (Doc. 450) at 12, Arndorfer "had that discussion" with Anderson about an open guilty plea, that is, "pleading straight up" guilty to all counts, *see* Arndorfer Dep. at 28:7-14, 51:7–15. He also explained the option of "[p]leading to just the drug case and going to trial on the gun case," and he told Anderson he might be able to "plead and preserve the issues for appeal," "all of those things." Arndorfer Dep. at 51:16–22.

However, Arndorfer valued the potential benefits of going to trial more than a two- or three-level guideline reduction for acceptance of responsibility. He explained why. The § 851 Information and Count 30, the gun charge, were the only two factors that could alter the statutory penalty range. Anderson had no control over those two factors. Seykora was "not going to agree to a sentence or a plea agreement that backs off the gun charge or backs off the 851. He would not do it." Arndorfer Dep. at 32:2–4. There was no point in worrying about the § 851, because if Seykora could prove it, it would command a life sentence regardless of whether Anderson pled guilty or went to trial. And if Seykora could not prove it, the guidelines and the consecutive five-year term on a § 924(c) conviction might result in a life or near-life sentence anyway.

So, Arndorfer said, the question was simply whether trial or a guilty plea was likely to work out best for Anderson. *See* Arndorfer Dep. at 30:19–24. "The only difference between pleading and not pleading to all of the counts [was]

28

acceptance of responsibility." *Id.* at 31:17–19; *see also* U.S.S.G. § 3E1.1.

Arndorfer acknowledged strong evidence that Anderson was guilty of drug

trafficking, but he thought the quantities suggested by the pretrial discovery were

"insanity." *Id.* at 43:5. He also thought the evidence supporting the gun charge

was weak. Agents found marijuana, packaging materials, bills that had been used

in a controlled buy, and a gun at Nate Davis's house when they searched it. At

Anderson's house, however, they found packaging materials and more and larger

quantities of drugs, but no gun. And Anderson had been stopped by Billings police

officers on numerous occasions. He never had a gun. *See* Arndorfer Dep. at

21:18–23, 29:16–21, 40:16–24.

Arndorfer told Anderson the guideline calculation was so high "he might be

facing life even under the guidelines," with or without prior convictions. *Id.* at

16:21–25, 26:2–8, 29:7–15, 32:13–19.[8] But Arndorfer believed Judge Cebull

would realize that Anderson "was a small-time drug dealer" who "didn't have

some big house on the hill" or "drive fancy cars" or hang out "down in Vegas

gambling all the time." *Id.* at 47:14–23. Arndorfer also thought the judge would

see the goofball's testimony was unreliable. During part of the time the goofball

---

[8] Arndorfer once referred to a "mandatory minimum 360," Arndorfer Dep. at 29:13–14, but that appears to have been a misstatement. No one has suggested that Arndorfer told Anderson the guidelines were mandatory. Arndorfer understood the distinction between mandatory life under 21 U.S.C. §§ 841(b)(1)(A) and 851 and an advisory guideline range of life or 360 months to life. *See, e.g.*, Arndorfer Dep. at 25:13–26:8

said Anderson was selling drugs, Anderson was in jail in California. *See id.* at 18:1–8, 31:3–8, 43:6–9. And, Arndorfer said, the goofball was a skinhead racist who was also mad at Anderson personally because Anderson stole his girlfriend. *See, e.g., id.* at 18:1–8, 42:12–21, 43:2–5.

Arndorfer explained to Anderson that entering an open plea to all 30 counts of the Superseding Indictment might well put him in the highest guideline ranges on the drug counts, plus a mandatory consecutive five-year sentence under 18 U.S.C. § 924(c) on top of the guideline sentence. *See, e.g.,* Arndorfer Dep. at 28:7–14, 29:11–15. And if Seykora proved two or three prior convictions, the sentence would be life in prison—plea or nor plea, gun or no gun.

Arndorfer also explained that Anderson could "plead to everything except the gun charge" and go to trial on that count, or he could file a motion for leave to enter a conditional guilty plea to Count 1, preserving his right to appeal the denial of his suppression motion. *See* Arndorfer Dep. at 27:25–28:2. Arndorfer explained he had arranged a conditional plea previously in a case before Judge Shanstrom. *See id.* at 28:3–4, 33:18–35:4. He was "not very confident the judge [was] going to rule in our favor," *id.* at 34:23–24, but the idea was to demonstrate that Anderson accepted responsibility for drug trafficking and disputed only the extremely high quantity of drugs the United States attributed to him. As Arndorfer put it, "I don't see how the judge cannot give you acceptance of responsibility if

you offered a plea to him." *Id.* at 32:22–24; *see also* U.S.S.G. § 3E1.1 cmt. n.1(a) ("a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction").

Arndorfer also thought it would be "[m]uch easier to get a full-round cross-examination . . . at trial than at a sentencing hearing." He saw trial as an opportunity "to attack relevant conduct." *Id.* at 30:25–31:2, 33:12–17. Asked whether going to trial "hurt Fritz or helped him," Arndorfer replied, "[A]fter trial, I strongly believed it helped." Arndorfer Dep. at 41:25–42:1. Arndorfer's "feeling after trial was that [Judge] Cebull was going to [be] able to see [the goofball] is not reliable. We can't use these quantities." Arndorfer Dep. at 43:2–5. Arndorfer also "thought it was helpful to Fritz to show the judge that he didn't routinely carry guns," and Judge Cebull "even commented that he thought we had a real good shot at this gun issue." *Id.* at 43:12–20. "I thought we had gained ground" and "accomplished some of the things that I was hoping." *See id.* at 43:18–25.

At sentencing, Arndorfer's prediction of Judge Cebull's evaluation of the evidence proved wrong. Both the probation officer who prepared the presentence report and Judge Cebull held Anderson responsible for the drug quantities the witnesses testified to at trial, as if the jury had found those quantities. *See id.* at 43:9–11, 44:1–9. But this mistaken prediction does not make counsel's advice unreasonable. "[U]ncertainty is inherent in predicting court decisions." *McMann*

31

*v. Richardson*, 397 U.S. 759, 771 (1970). Arndorfer had a reasoned basis for every aspect of his advice to Anderson.

On the other side of the coin, it appears Anderson does not understand what likely would have happened if he had pled guilty. At the evidentiary hearing, Anderson said:

> I would have pled guilty and then tried to argue for a lesser guidelines for—because, you know, they used enhancements to enhance my sentence and increase my drug amount in this case. That was pretty much the basis of my sentence, which increased it with the enhancements and all that. But if I was able to plead guilty, then I can just still argue those, you know, instead of having to go to trial. And—because I really had no defense at trial as far as the case.

*Id.* at 18:16–25.

As to the enhancements, there is no indication Anderson could have disputed the probation officer's findings that he "involved minor females in the distribution of drugs" or that he was "the leader and organizer of all of the co-defendants." These findings added six levels to the base offense level. *See* Presentence Report ¶¶ 99, 101.

Nor is there any indication that Anderson's decision to go to trial affected the base offense level. If the drug quantities at sentencing were merely those alleged in the superseding indictment, the base offense level would have been 34. Had everything else remained the same, Anderson's advisory guideline range would have been 262 to 327 months (34 + 6 − 3 = 37), plus a 60-month

32

consecutive term on Count 30. But, as explained above, Seykora's approach to the case strongly suggests he would have called the case agent, probably the "goofball," and possibly one or more other cooperating witnesses to testify at sentencing to push the drug quantity as high as he could. Neither party has suggested the pretrial discovery reasonably could have supported a lesser drug quantity than the trial testimony. In fact, the record suggests they were the same, *see* Seykora Dep. at 25:17–26:1; Sentencing Tr. (Doc. 343) at 13:5–13, and obviously far more than necessary to reach a base offense level of 38.

Consequently, had Anderson pled guilty, his total offense level likely would have been 41 (38 + 6 − 3 = 41). With a criminal history category of III, Anderson's advisory guideline range would have been 360 to life, plus the 60-month consecutive term on Count 30. That is the range Judge Cebull actually applied at Anderson's sentencing after he was convicted at trial. It is consistent with Arndorfer's advice to Anderson before trial.

## C. Conclusion

Anderson testified that he decided to go to trial because he believed he was facing a mandatory life sentence. It is reasonable to believe Anderson would have pled guilty to all charges if he had been certain he did not face a statutory mandatory minimum life sentence.

But many defendants in Anderson's position will be uncertain about their

33

statutory sentencing range at the time they must choose between pleading guilty and standing trial. A defendant is not entitled to certainty, only to counsel's "informed opinion as to what plea should be entered." *Von Moltke*, 332 U.S. at 721. To establish that counsel's informed opinion amounted to ineffective assistance, Anderson "must demonstrate gross error on the part of counsel." *Turner v. Calderon*, 281 F.3d 851, 880 (9th Cir. 2002) (quoting *McMann*, 397 U.S. at 772).

He has not carried that burden. Arndorfer reasonably anticipated the drug quantity used at sentencing would exceed the quantities alleged in the superseding indictment. He reasonably believed Anderson had a realistic chance of acquittal on Count 30, and it was reasonable to weigh that chance by discounting the relatively small difference between the two- or three-point guideline reduction for acceptance of responsibility and the mandatory consecutive five-year term on Count 30. Arndorfer understood Seykora would pursue the highest possible sentence for Anderson—if possible, a statutory penalty of life in prison, and if necessary, a guideline range of life in prison. Arndorfer reasonably created an argument for acceptance-of-responsibility credit, despite going to trial, by moving to enter a conditional guilty plea to Count 1. And, although Arndorfer's prediction was incorrect, it was reasonable to believe Judge Cebull would find "the goofball" and possibly other witnesses less credible if he saw and heard them testify under cross-

examination.

Anderson has not shown that counsel's performance was unreasonable. The first prong of the *Strickland* test is not met. The claim of ineffective assistance is denied.

A new sentencing hearing will be set by separate order. When an amended judgment is entered, the Court will also issue an order on a certificate of appealability and enter judgment in the civil case corresponding to the § 2255 proceeding.

Accordingly, IT IS ORDERED that Anderson's claim alleging ineffective assistance of counsel with respect to his prior felony drug convictions and statutory penalty range is DENIED.

All claims now having been decided, Anderson's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 is GRANTED in part and DENIED in part as set forth in this Order and the Order on the *Giglio* claim (Doc. 505).

DATED this _14th_ day of February 2019.

_Susan P. Watters_
Susan P. Watters
United States District Court